## MOORE v. KELLEY.

(Court of Civil Appeals of Texas. Amarillo. Jan. 3, 1914. On Motion for Rehearing, Jan. 24, 1914.)

1. BROKERS (§ 67*)—COMPENSATION.

A broker authorized to sell or exchange property is not entitled to compensation from his principal, where he receives compensation from the purchaser.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 52–54; Dec. Dig. § 67.*]

2. BROKERS (§ 65*)—COMPENSATION — FRAUD BY BROKER.

Defendant placed land with plaintiff for sale on commission and instructed plaintiff to report to him any offers of a cash sale, and plaintiff found a purchaser for defendant's property in W., who told plaintiff to find a purchaser for defendant's land, and that he would buy it and immediately resell. W. procured an oral option from defendant for the purchase or exchange of defendant's land, and about the same time plaintiff found another cash purchaser for the land which defendant was to exchange to W., without communicating such cash offer to defendant, however; whereupon W. exchanged land with defendant and immediately accepted the cash offer for defendant's land, and the cash purchaser of the land from W. paid plaintiff a commission. Held, that plaintiff's failure to communicate the cash offer to defendant was a fraud upon defendant, precluding recovery of commissions by plaintiff.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 48–50; Dec. Dig. § 65.*]

3. PRINCIPAL AND AGENT (§ 84*)—GOOD FAITH OF AGENT.

An agent who fails to disclose any fact which would naturally influence his employer's conduct or acts adversely to his employer is guilty of a fraud upon him, so as to forfeit his right to compensation.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 221; Dec. Dig. § 84.*]

### On Motion for Rehearing.

4. APPEAL AND ERROR (§ 712*)—RECORD.

An ex parte document not made a part of the appellate record cannot be considered on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2951–2954; Dec. Dig. § 712.*]

Appeal from Scurry County Court; C. R. Buchanan, Judge.

Action by Ed Kelley against N. B. Moore. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

Perkins & Perkins, of Snyder, for appellant. Higgins & Hamilton and M. E. Rosser, all of Snyder, for appellee.

HENDRICKS, J. We make the same disposition of the motion to strike the statement of facts and bills of exception in this cause as we made in the cause of Beaver v. Wills, decided December 20, 1913; the grounds of the motion in both causes being the same, except that in the motion in the other cause a ground for suppressing the statement of facts on account of two separate statements, having been presented in that record (one with reference to a plea of privilege and the other with reference to the merits), is not presented in this record for the purpose of suppressing the statement.

The appellee, Kelley, a real estate agent, sued the appellant Moore in the county court of Scurry county, Tex., alleging that he effectuated a sale of the latter's land, having found a purchaser of same at a price of $10,000 in trade and $5,000 in cash, upon a commission of 5 per cent. upon the amount realized in trade and 2½ per cent. upon the amount realized as cash by said Moore for the sale of his land.

The appellant, additional to other things pleaded by him, alleged, in substance, that appellee acted in bad faith with reference to the representation of his interests and was guilty of a double agency between him and the purchaser of the land, and received certain offers for said land which were not communicated to appellant. The appellant asserts that the following special instruction should have been given, which was not sufficiently covered in the main charge: "You are instructed in this case that if you believe from the evidence that Ed Kelley was the agent of N. B. Moore during the months of December, 1912, and January, 1913, and that while so acting as N. B. Moore's agent

for the sale of Moore's land located in Garza county, Tex., he, Kelley, received an offer or offers to buy the said land of said Moore, and that Kelley did not disclose such offers to Moore, you are instructed to return your verdict in favor of the defendant, although you might believe that Ed Kelley intended no fraud on the said Moore." He also says that the verdict of the jury is contrary to the law and the evidence, for the reason that his allegations of fraud in regard to appellee's agency were so clearly established that the jury should have been peremptorily instructed, for the reason, as suggested by his proposition, "when an agent claims a commission by virtue of having procured a purchaser for his principal's land, and the evidence plainly shows that he concealed material facts of vital importance from his principal, it is the duty of the court to instruct the jury to return a verdict in favor of the defendant."

Moore was the owner of the land, and Kelley was his agent for the purpose of selling the same upon a commission contract of 2½ per cent. commission upon the cash, and 5 per cent. commission on trade, to be realized upon the sale. Kelley testified: "I had this Moore land listed with me somewhere between the 1st and 15th of July. Mr. Moore told me on this trade if I got any cash offer to bring it to him. I submitted no entire cash offer to him. I did not submit any offer to him of part cash and the rest in notes." Moore, the owner of the land also testified that he instructed Kelley, the agent, that if he received any cash offer for the land to bring the same to him.

Kelley found a purchaser of the land in one Wellborn. When he first spoke to Mr. Wellborn with reference to purchasing or trading for the Moore property, Kelley says that Wellborn "told me to find a purchaser for the Moore land. He said he would buy it and turn it immediately. He said before he would make the deal I would have to find some one to trade the Moore land to." Wellborn had a business house and a residence in the town of Snyder, the county seat of Scurry county, when he desired to put in on the deal with Moore at the price of $10,000. The list price made by Moore to Kelley, the broker, was $15,000 and whatever valuation was placed upon the property as a part of the consideration, the remainder was to be paid in cash; Moore, however, as stated, instructing Kelley, if he secured an offer entirely of cash, to bring the same to him. After Kelley's conversation with Wellborn, and in pursuance of Wellborn's statement that before he would make the deal he would have to find some one to trade the Moore land to, Kelley found one Boren, who at first it seems agreed to pay $13,000 for the property, which proposition Kelley immediately communicated to Wellborn and which Wellborn accepted. Boren, however,

withdrew his offer, renewing it in another form and upon a different consideration, which Wellborn refused. After this, Wellborn procured an option, so called in this record, from Moore, upon terms not stated for the purchase or trade for the latter's land. This was an oral arrangement between Moore and Wellborn without any consideration whatever, and we gather conclusively that it was not binding on either party. During the pendency of this oral option, Kelley found another purchaser, one Pete Scoggins, for Wellborn at $13,000 for the land, without communicating the offer to Moore. Wellborn had told Kelley that he would take $13,000 for the Moore property in the event that he could trade his business and residence property in Snyder, with the additional cash for the land, and Wellborn immediately accepted the Scoggins offer; the former closed a deal with Moore on the basis of $15,000, valuing his property at $10,000 and paying $5,000 in cash. Wellborn had also informed Kelley that he would take $2,000 less than the whole amount of the consideration from him to Moore. Kelley says that Wellborn "told me I would have to look to the other man for my commission as he [Mr. Wellborn] was taking $2,000 less than what he was giving for it. I got $325 commission on the Wellborn-Scoggins deal"—the commission was paid by Scoggins. Of course Kelley admits that during this period he was representing Mr. Moore as his agent.

[1] It is thoroughly settled in this state, and the weight of authority outside of this state is to the effect, that a broker acting without the knowledge of his principal, as agent for the sale or exchange of the principal's property, and receiving compensation from the purchaser, is not entitled to compensation from the principal. Mechem on Agency, §§ 643, 698; Armstrong v. O'Brien, 83 Tex. 635, 19 S. W. 268.

The case of Armstrong v. O'Brien, 83 Tex., supra, in so far as it is pertinent to the proposition involved here, is as follows: The executors of an estate employed agents to sell the land of the estate. Under the will of the testator, it seemed that the land could only be sold for cash. The agents communicated with one party with reference to certain land he had for sale for the executors —Dart being another real estate agent in another county. The correspondence between the respective agents developed this condition: Dart found Lutcher & Moore as purchasers for the property, but the latter were unable to pay the cash consideration prescribed in the will as a limitation upon the sale of the property, but were only able to pay half cash, the balance to be evidenced by deferred vendor lien notes. Dart arranged to hypothecate the notes so that the full cash consideration could be realized to the executors, but the latter refused to consum-

mate the deal. It seems that Dart and the agents of the executors agreed that the deed would be made to Dart, and Dart was to sell to Lutcher & Moore, and Dart, as the payee in the notes, to negotiate them. The executors' refusal to consummate the trade was not on account of the nature of the transaction—of course they were receiving all cash —but on the ground of an increased value in price which they claim they placed upon the property. Dart was to receive a commission from Lutcher & Moore, to be evidenced by an increased price he placed on the land in the sale from him to the former. There was evidence suggesting that the agents of the executors and Dart had an agreement between them to divide both commissions, the one Dart was to receive from Lutcher & Moore, and the commission O'Brien and Johns, the executors' agents, were to receive from the latter. The Supreme Court said: "It is well settled that a person cannot act in the capacity of agent for both the buyer and seller, and receive commissions from both; and from principles of public policy, such an agent would not be allowed to recover compensation from either party unless he should so act with the full knowledge and consent of both principals. * * * It makes no difference that the principal was not in fact injured, or that the agent intended no wrong, or that the other party acted in good faith." In this case a special charge was requested which the court refused, embodying the foregoing principle, and the Supreme Court further said: "There was evidence tending to show that Dart was acting for O'Brien and Johns in assisting them to obtain a purchaser for the land, and that there was an agreement between them to divide commissions, which were to be collected both from the executors, who were the sellers, and from Lutcher & Moore, who were the buyers, and the charges requested should have been given * * *; and it would be inconsistent with O'Brien's duties to his principals to sell the land * * * to Dart, * * * if Dart was acting in the capacity of agent with O'Brien, and to resell them to Lutcher & Moore for a profit or commission."

Of course, the Supreme Court case quoted from and the case at bar are not strictly together upon the facts. We are inclined to think, however, that the similarity is considerable. In that case, Dart, it is true, was to constitute himself a vendee for the purpose of effectuating the deal on account of the cash consideration prescribed in the will, which was in the chain of title. In the case at bar, the testimony is quite suggestive that he would not take the land from Moore unless Kelley found him another purchaser, which Kelley did in one Scoggins. Of course this assisted the deal between Moore and Wellborn, and appellee contends that this being true, and the fact that Wellborn did not pay Kelley any commission and that Scoggins did, eliminated any fraud upon the part of Kelley. While in the Supreme Court case Dart would have been only a nominal purchaser, if the executors of the estate had consummated the deal, and in this case it may be that Wellborn was a real purchaser, the incompatible and inconsistent position Kelley places himself in, in regard to his agency, was that he was instructed by his principal, and it was a part of his contract, to submit cash offers made to him from a prospective purchaser to Moore, and which in this instance he failed to do. It may be that the Boren matter with reference to the offer of $31,000 does not assist the proof of appellant's issue, and should not be considered except as corroborative of intent. The oral option between Wellborn and Moore was, of course, worthless. As long as the option existed and the trade was not finally consummated of course Kelley had no commission. There was a chance for a double commission, and, as between Kelley and Moore, there had to be another purchaser before Wellborn would consummate his deal with Moore. It is conclusive that if Wellborn had paid Kelley a commission, Kelley could not recover, if he failed to communicate his relation to his principal.

[2] We believe the policy of the law underlying the legal principle, with reference to a strict representation of the interests of the principal by the agent, precludes the right of recovery on the part of Kelley. If Wellborn agreed to sell the property he was getting from Moore for $2,000 less than the recited consideration between him and Moore, it was evidently based upon a real valuation he placed upon his business house and residence in Snyder. Moore said that he considered the $13,000 offer of Scoggins to Wellborn, which he knew nothing about until he conveyed his land to Wellborn, was a better proposition than the trade with Wellborn. Appellee seems to think that because Moore and Wellborn traded upon an agreed valuation in pursuance of an oral option, and that Kelley received his commission from Scoggins, and not from Wellborn, all fraud is eliminated. However, if Moore and Wellborn even agreed on $15,000 cash, and the latter actually paid it to the former, and also paid Kelley $325 commission, Kelley could not recover commissions from Moore unless Moore knew such fact before the trade was closed. "It makes no difference that the principal was not in fact injured or that the agent intended no wrong, or that the other party [the purchaser] acted in good faith." It is not specifically stated in the testimony that Wellborn received $13,000 in cash, but appellant asserts in his statement that Scoggins' offer was $13,000 cash, and it is not denied by appellee, and we construe the record conclusively—the Scoggins deal was cash. Appellee contends that his relationship with Wellborn and Scog-

gins is not incompatible with his duty to Moore.

[3] "An agent is held to uberrima fides in his dealings with his principal; and, if he acts adversely to his employer in any part of the transaction, or omits to disclose any intent which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal as to forfeit any right to compensation for services." Murray v. Beard, 102 N. Y. 505, 7 N. E. 553. Both Wellborn and Moore were interested in a cash proposition for the .land; Moore had instructed Kelley, which the latter admits, if he received such an offer to report the same to him. Wellborn, with this in view, obtains an oral option from Moore, and Kelley, acting with Wellborn, attempts to find another purchaser for cash .for Wellborn, and does so, and omits to disclose the fact of a cash purchaser to Moore, whom he still represents, and in violation of the very instructions given him. He knows that Wellborn will take $2,000 less for the land if he can get the cash; a reduction of $2,000, of course, to apply on the value of the Snyder residence and business house, which he was trading to Moore at $10,000. Both Wellborn and Moore being interested in procuring a cash purchaser for the land, Kelley necessarily, in attempting to represent both parties in obtaining such a cash purchaser, placed himself in an incompatible position—at least to that extent.

The case of Kinsland v. Grimshawe, 146 N. C. 397, 59 S. E. 1001, cited by appellee as to some features, and superficially examined, may evidence an analogy, but, properly sounded, we do not believe it applies. The landowner in that case employed the broker to sell on certain terms, and the broker found a purchaser who was buying for speculation, and an option contract was finally consummated in writing upon a valuable consideration, the landowner agreeing to convey to the purchasers "or their assigns at the price and according to the terms of May 27, 1903;" and the landowner executed the deed to an assignee of the purchaser under the option contract, and not directly to the assignee, the property having in the meantime been sold .by the broker for the option contract purchaser, and upon an agreement with the broker for a commission. The Supreme Court of North Carolina said in that case, 146 N. C. 402, 59 S. E. 1002: "Instead of plaintiff's contract with Graves [the option contract purchaser] preventing a sale, it was conducive to it. He was, in a certain sense, 'serving two masters,' but both were working to a common end." It may be true in this cause that Kelley in working for Wellborn it was conducive to the trade Moore had on with Wellborn, but here Wellborn wanted a cash purchaser in order to complete the deal, and Moore had also instructed Kelley if he procured one to report

it to him. Wellborn says: "I am not sure that I had reached an agreement with Scoggins before I told Moore I would take the land. * * * I was pretty sure Scoggins would take it before I traded with Moore [probably meaning the final word to Moore that he would consummate the verbal option]. * * * This option I had with Moore was for the purpose of raising money, and if I could raise it I would trade with him." Wellborn again says: "Kelley interested me because of the fact that those fellows would take it off my hands. * * * I did tell Mr. Kelley I would let him have all he could make over $13,000." Here they were not altogether working to. a "common end" as in the Kinsland-Grimshawe Case, supra. Kelley and Wellborn were working to a "common end," but Moore did not participate. "It is also a fundamental duty of the agent to obey all of the reasonable and lawful instructions given him by his principal." Mechem on Agency, § 473. It was Kelley's duty to report a cash purchaser to Moore for his consideration; it was Wellborn's desire also to obtain a cash purchaser for Moore's land, which he probably would not take from Moore unless he was so procured, and at this point the antagonism of interest and position arose, Kelley procuring the excess in the price of the land by a direct commission from Scoggins. It may be that Kelley, by his conduct, intended good faith, but we think the law nevertheless condemns it, and the cause is reversed and rendered in favor of appellant against appellee, and for all costs.

Reversed and rendered.

### On Motion for Rehearing.

The appellee in this cause, in the motion for rehearing, insists that we misunderstood the statement of facts in concluding that the deal between Scoggins and Wellborn, for the property sold by Moore to Wellborn, was a cash transaction, and appends to the motion aliunde evidence and an affidavit as a presentation of the transaction. Wellborn, who had the oral option with Moore, testifies that it "was for the purpose of raising money, and if I could raise it I would trade with him," meaning Moore. Kelley, the appellee, in referring to the Wellborn-Scoggins deal, whereby Wellborn sold the Moore land to Scoggins, testified that Wellborn "realized something near $13,000 for the ranch property in Garza county that he got from Mr. Moore." Wellborn further said: "In letting the Moore land go at $2,000 less than he paid for it, he figured he could buy another piece of property that would suit him better." The serious and important issue in this cause was a complaint of the violation of instructions by Moore to Kelley to report offers of a cash transaction and was specifically raised by the appellant, and the argument in his brief was based upon the theory, as we construe it, that Scoggins' offer and trade with Wellborn constituted a cash transac-

tion. We construed the record conclusively, and think it a fair and reasonable construction from the testimony that the same was a cash transaction, and we are compelled to act upon the record as we find it.

[4] As stated by us, in the case of Kell Milling Co. v. Bank of Miami, 155 S. W. 328, where stenographer's notes, upon motion for rehearing, were attempted to be adduced as evidence of the real transaction: "The consideration of an ex parte document to the extent of basing a review upon same would of course be highly improper." If we considered such matters we would be constantly reviewing cases upon appeal, not upon the record, but upon ex parte statements of fact, which, as a matter of policy, would lead to inextricable confusion and destroy the purpose and province for which this court was created. Though we find that the record is compatible clearly with that conclusion of fact and excludes any other (and upon reconsideration of the statement of facts our view is strengthened in this respect), however, if we did conclude something that the record does not show, that is, that Scoggins' deal was part cash and part something else, we are not sure as a result of the principle, based upon the duty of agent to principal in protecting the latter's interest, that the result of this appeal would have been different, which, however, we do not decide. We think the legal merits of this case have been solved, and the motion for rehearing is in all things overruled.