**Donnie DOUGLAS, Individually and d/b/a Blackhawk Production, Appellant,**

v.

**AZTEC PETROLEUM CORPORATION, Appellee.**

**No. 12–83–0046–CV.**

Court of Appeals of Texas, Tyler.

July 25, 1985.

Brendan J. Doran, Palestine, for appellant.

John C. Andrews, Dallas, E. Ray Andrews, Athens, for appellee.

## ON MOTION FOR REHEARING

BILL BASS, Justice.

Our opinion dated May 9, 1985, is withdrawn, and the following is substituted.

Donnie Douglas, individually and d/b/a Blackhawk Production ("Douglas"), filed suit against Aztec Petroleum Corporation ("Aztec") to enforce a letter agreement between Douglas and Aztec. Under the agreement Douglas claimed he was due an overriding royalty interest in the oil and gas leases he had acquired for Aztec as part of the compensation for their acquisition. Aztec denied liability asserting that Douglas had not completed his services for Aztec in an "honest and forthright manner," as required by the letter agreement,[1]

---

**1.** The agreement reads as follows:

"This agreement is entered into, by and between Aztec Petroleum Corp. and Donnie Douglas d/b/a Blackhawk Production.

"Upon the completion of lease acquisitions in Anderson County, Texas, on behalf of Aztec Petroleum, Donnie Douglas shall have earned five thousand ($5,000.00) dollars in prepayment by Aztec Petroleum. He shall also be entitled to an overriding royalty interest of ½ of the percentage spread from 75% to the landowners royalty less 2% assigned to Johnny Hardman. This ORRI is earned by Donnie Douglas only after he has completed his services to Aztec in an honest and forthright manner.

"The ORRI is applicable on all wells drilled on acreage leased by Douglas on behalf of AZTEC. "In the event acreage is farmed out or sold by Aztec, and a lease in excess of 75% is required by the purchaser, Douglas shall allow the sale based upon receiving ½ of the ORRI percentage spread allowed after assignment of Johnny Hardman's 2% ORRI. Leasing completed as of this date, 6–20–80.

/s/ Dick Seib
    President, Aztec Petroleum
/s/ Donnie Douglas
    Donnie Douglas-Blackhawk Production"

but instead had falsified records and converted and embezzled funds advanced to Douglas to buy the leases. By counterclaim Aztec sought actual and exemplary damages from its agent Douglas for falsification of records, forgery, theft, conversion and embezzlement. A trial by jury resulted in a judgment denying Douglas the overriding royalty interest and awarding Aztec $107,834.57 actual damages and $100,000 exemplary damages. We affirm.

In February 1980 Aztec's president, Richard Seib, engaged Douglas to buy a 4900 acre block of leases for Aztec in Anderson County. For his services Douglas was to receive $5,000 together with an assignment of an overriding royalty interest in the leases obtained. This much of the oral agreement is reflected in the letter agreement of June 20, 1980, prepared and signed after the completion of leasing.

On February 23, 1980, Aztec sent Douglas a $5,000 payment in advance for buying the leases and two other checks totaling $124,180 to pay for leases. Douglas immediately went to work getting the block together. By the end of March all but a few tracts had been leased.

Douglas had a $60 personal checkbook balance when he made the agreement with Aztec. As soon as Aztec's money arrived, Douglas put it in his own account and embarked on a spending spree. He bought two cars and a boat, paid numerous personal expenses and retired two bank notes out of the account recently filled with Aztec money. Later a photocopy of each check was sent to Aztec with the payee altered to show that a lessor had received the money actually spent on personal items.

Douglas did not put all of Aztec's money in the bank. During the acquisition period, Aztec sent Douglas $343,557.35. Forty-two thousand dollars was kept as cash by Douglas and never deposited. When he made the final accounting to Aztec in June 1980, Douglas sent bogus receipts to show that the cash went to lessors. He admitted at trial that he did not really obtain receipts

for cash payments but that his wife had forged all of those sent to Aztec by transposing signatures of lessors from other documents.

The following are some of the more striking admissions made by Douglas during the course of his testimony:

1. he retained $42,000 in cash out of the checks Aztec sent him;

2. he did not obtain receipts for the cash as it was used but that his wife later forged receipts to show that it had all gone for the purchase of leases;

3. he put all the rest of Aztec's funds into his personal account;

4. he altered photocopies of between "five and forty" of his personal checks so that they appeared to be made to lessors for their interests;

5. some of the altered checks actually cleared the bank as follows:

    (a) $8,412.00 to Bacon Chevrolet for a Z–28 for his daughter;

    (b) $7,384.00 for a boat for himself;

    (c) $5,760.00 to Royce Chevrolet for a chevette for his wife;

    (d) $4,076.00 payment on a personal note to National Security Bank;

    (e) $316.00 and $178.48 used for personal expenses;

    (f) $2,341.00 payment on a personal note to National Security Bank; and

    (g) $301.00 to his family dentist.

6. he prepared the account given to Aztec June 20, 1980, using forged receipts and altering the amount and payee of checks to "plug in" whatever figure was necessary to come up to $338,557.35, the amount committed to his charge.

Once most of the leases were obtained, Douglas became very anxious to receive his override. But Seib kept badgering Douglas for an accounting. Thinking he was to receive the assignment of the override, Douglas took the concocted false account to Dallas on June 20, 1980, together with the forged receipts and altered checks sup-

porting it. No assignment changed hands, but the letter agreement was executed.

Seib testified that upon receipt of the account he contacted some of the lessors and discovered several who were not paid the amounts reported. With this knowledge he refused to convey the override to Douglas.

Jack Coleman, a CPA for Aztec, testified from an audit of Douglas' and Aztec's records it appeared that $107,874.57 could not be related to the purchase of oil leases nor to Douglas' $5,000 compensation or expenses.

Douglas defends his conduct saying that he and Seib agreed that Aztec should advance purchase money to Douglas based upon a $75-per-acre lease price. If, as contemplated, Douglas bought the leases at a cheaper price, the savings would be split three ways, two shares going to Douglas and wife and one to Seib. In his testimony Douglas recalled that Seib had told him to forge receipts and alter checks to show a false higher cost for the leases because Seib was having cash flow problems. Douglas acknowledged that he was also supposed to report to Seib the actual price paid. Douglas introduced no figures to show what Seib's kickback should have been under the alleged secret deal.

Seib denied the existence of the secret bargain as well as the receipt of any confidential payment. He also disclaimed instructing Douglas or his wife to alter checks or forge receipts in furtherance of such a scheme.

Three issues were submitted to the jury. The issues and the jury's answers are as follows:

SPECIAL ISSUE NO. 1

Do you find from a preponderance of the evidence that Donnie Douglas failed to complete his services to Aztec in an honest and forthright manner?

Answer 'Yes' or 'No.'

ANSWER: Yes.

SPECIAL ISSUE NO. 2

What sum of money, if any, do you find Aztec was damaged as a result of Donnie Douglas' failure, if any, to complete his services in an honest and forthright manner?

Answer in Dollars and Cents, if any.

ANSWER: $107,874.57.

SPECIAL ISSUE NO. 3

What sum of money, if any, do you find that Aztec should be awarded against Donnie Douglas as exemplary damages for his failure, if any, to complete his services in an honest and forthright manner?

'Exemplary damages' means an amount of money which you may in your discretion award as a penalty or by way of punishment, or as an example to others, and which is in addition to any amount which may have been found by you as actual damages.

Answer in Dollars and Cents, if any.

ANSWER: $100,000.00.

Based on these findings by the jury, Aztec was awarded damages in the amount of $107,874.57, plus exemplary damages in the amount of $100,000.00, costs and interest. The trial court further held that Douglas was not entitled to an overriding royalty interest in any of the leases he acquired on behalf of Aztec.

Douglas contends that the phrase in the letter agreement, "This ORRI [overriding royalty interest] is earned by Donnie Douglas only after he has completed his services to Aztec in an honest and forthright manner," if it deserves to be given any force, can be effective only as a condition precedent or a covenant, but not both. If it is a condition precedent, its breach will not support damages but will excuse Aztec's future performance to convey Douglas the override. If it is a covenant, damages are the only appropriate remedy for its breach. Therefore Douglas maintains the trial court's judgment excusing Aztec's future performance (conveyance of the override) and awarding actual damages rests on inconsistent implied findings that the provision in question is both a condition precedent and a covenant.

Appellant argues that if the provision must be given any legal effect, it must be regarded as a covenant. Therefore Aztec's promise to convey the override is not excused, and the judgment denying Douglas the override is improper.

In his third, fourth, sixth and seventh points of error, Douglas argues that even if the covenant was breached, Aztec did not plead breach of contract nor adduce evidence at trial referable to breach of contract. Therefore the judgment of the trial court awarding actual damages of $107,-834.57 is unsupported by pleading and proof. He further claims that even if actual damages are proper, exemplary damages are not recoverable in contract unless a coincident tort is pleaded and proven. Since no tort issue was submitted to the jury, Douglas argues Aztec waived recovery upon a tort theory by failing to request special issues thereon.

In his eighth and ninth points of error, Douglas complains of the trial court's refusal to submit a requested special issue and instruction he believes critical to his estoppel defense.

Douglas asked for the following special issue:

Do you find from a preponderance of the evidence that the method of completion of the services of Donnie Douglas to Aztec was directed by Richard Seib?

The requested instruction read as follows:

By the term 'completed his services to Aztec in an honest and forthright manner' is meant failure, if any, by Donnie Douglas to carry out his duties in the manner directed by Richard Seib after their agreement, if any, that the overriding royalty interest was earned by Donnie Douglas only after he completed his services to Aztec in an honest and forthright manner.

Douglas claims he pleaded and proved that Aztec was estopped to claim he did not act in an honest and forthright manner because he says his dishonest behavior was procured by Aztec's president. In support of his requested instruction, he argues that his honesty should be judged in the context of the agreement he says existed, an agreement whose execution necessarily required forgery, kickbacks and falsification of records.

It will aid our analysis to first consider the defensive matters raised by appellant's eighth and ninth points of error.

There are several reasons why the defense of estoppel is not available to Douglas. To invoke the doctrine of estoppel, all the necessary elements of estoppel must be present. *Clifton v. Ogle*, 526 S.W.2d 596 (Tex.Civ.App.—Forth Worth 1975, writ ref'd n.r.e.); 31 C.J.S. Estoppel sec. 67 (1964). One of its essential requisites is a *reasonable* or *justified* reliance on the conduct or statements of the person sought to be estopped by the person seeking the benefit of the doctrine. *Clifton v. Ogle, supra.* No estoppel exists in the absence of a showing of the right of reliance. *Kuehne v. Denson*, 148 Tex. 54, 219 S.W.2d 1006 (1949); 31 C.J.S. Estoppel sec. 71. Douglas says he entered into the secret bargain with Seib to pocket Aztec money, pay Seib kickbacks and cloak the scheme with forgery and misrepresentation. Assuming, for the sake of argument, the existence of such a pact, it is impossible to conceive that a jury could find Douglas' entry into it reasonable or justified. The purpose of estoppel is for the protection of those who have been misled by that which upon its face was fair. *Kuehne v. Denson, supra.* It is for the protection of the innocent, and only the innocent may invoke it. 31 C.J.S. Estoppel sec. 75 (1964). A conspiracy between Aztec's president and its leasing agent to secretly take corporation money can hardly be fair on its face. Quoting 31 C.J.S. Estoppel sec. 75 (1964), the El Paso Court of Appeals said, "A person may not predicate an estoppel in his favor on, or assert such estoppel for the purpose of making effective, obtaining the benefit of, or shielding himself from the results of his own fraud ... dereliction of duty, violation of the law, wrongful act or other inequitable conduct in the transaction

in question." *El Paso Nat. Bank v. S.W. Numismatic Inv. G.*, 548 S.W.2d 942, 949 (Tex.Civ.App.—El Paso 1977, no writ). The application of the doctrine here would give effect to the same sort of bargain denounced as illegal and void in *Hendricks v. Wall*, 277 S.W. 207 (Tex.Civ.App.—El Paso 1925, writ ref'd), in which the court was presented with a contract between a corporation's president and its advertising agent to kick back to the president 50% of the agent's commissions earned from the corporation.

■ The legal meaning of the words "honest and forthright" are the same as their ordinary meaning and required no definition in the charge. *Bell v. M.K.T. Railroad*, 334 S.W.2d 513 (Tex.Civ.App.—Fort Worth 1960, writ ref'd n.r.e.). The trial court was not in error in refusing to submit either the issue or the instruction. Appellant's eighth and ninth points of error are overruled.

■ In advancing his first seven points of error, Douglas artfully relies upon a purely contract analysis of the case. However, both Aztec's defensive pleadings and counterclaim state facts sufficient to allege Douglas' breach of fiduciary duty. Breach of fiduciary duty is a tort. *Crutcher-Rolfs-Cummings, Inc. v. Ballard*, 540 S.W.2d 380 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.); *Russell v. Truitt*, 554 S.W.2d 948 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n.r.e.).

■ It is uncontroverted that Douglas was Aztec's agent. An agency is a fiduciary relationship. *Hyde Corporation v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 769 (1958). The law requires more of a fiduciary than arms-length marketplace ethics. He owes his principal loyalty and good faith; integrity of the strictest kind; fair, honest dealing; and the duty not to conceal matters which might influence his actions to his principal's prejudice. *Anderson v. Griffith*, 501 S.W.2d 695 (Tex.Civ.App.—Fort Worth 1973, writ ref'd n.r.e.). He is obligated to exercise a high degree of care to conserve his principal's money and

to pay it only to those entitled to receive it. *City of Fort Worth v. Pippen*, 439 S.W.2d 660, 665 (Tex.Sup.1969). He must keep his principal's funds as a separate and identifiable account. *Searle-Taylor Machinery Co. v. Brown Oil Tools, Inc.*, 512 S.W.2d 335 (Tex.Civ.App.—Houston [1st Dist.] 1974). The agent must make an accounting to his principal of any money that has come into his possession because of his agency. *National Surety Co. v. McCutcheon*, 270 S.W. 1062 (Tex.Civ.App.—Fort Worth 1925, writ dism'd). "A fiduciary has no right to make merchandise of the confidence reposed in him." *Hendricks v. Wall, supra.*

■ Douglas' own testimony is a startling catalogue of violations of almost every fiduciary duty. It is undisputed that a substantial portion of the funds advanced did not go for the purposes stated in the agreement, the purchase of oil leases. Douglas admits spending large sums on two new cars, a boat, and other personal expenses almost immediately after getting Aztec's money. He admits failing to account honestly. He confesses forging receipts and altering checks to "plug in" whatever figures were necessary to add up to the $343,000 entrusted to him and to conceal the diversion of his principal's money. As justification he urges a secret kickback agreement with Aztec's president. As we have said previously, an estoppel cannot arise from such facts.

■ Appellant Douglas argues that Special Issue No. 1, which asked the jury if he "had failed to complete his services to Aztec in an honest and forthright manner," is not a distinctly tort issue. Therefore he contends Aztec waived recovery in tort since no tort issues were requested or submitted. However, this argument ignores the applicable principle that no waiver results, and indeed no issue should be submitted, if the evidence conclusively establishes an independent ground of recovery. TEX.R.CIV.P. 279; *Triton Oil & Gas Corp. v. Marine Contractors*, 644 S.W.2d 443 (Tex.1982); *Wright v. Vernon Compress Company*, 296 S.W.2d 517 (Tex.Sup.

1956); Hodges, *Special Issue Submission in Texas,* 219. "An issue is conclusively established when the evidence is such that there is no room for ordinary minds to differ as to the conclusion to be drawn from it." *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059, 1063 (1893). The evidence in this case overwhelmingly and conclusively demonstrates Douglas' breach of trust. Douglas' own testimony establishes it. We therefore conclude that Douglas' breach of fiduciary duty is established as a matter of law. It is a fundamental principle of our law that an agent who acts adversely to his principal or otherwise breaches his fiduciary obligation is not entitled to compensation for his services. *Anderson v. Griffith,* 501 S.W.2d 695 (Tex.Civ.App.—Fort Worth 1973, writ ref'd n.r.e.); *Russell v. Truitt, supra; Moore v. Kelley,* 162 S.W. 1034 (Tex.Civ.App.—Amarillo 1914, writ ref'd n.r.e.). In *Jackson v. Williams,* 510 S.W.2d 645 (Tex.Civ.App.—Beaumont 1974, writ ref'd n.r.e.), the court cited with approval sec. 469 Restatement of Agency which states:

> An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.

The override represented compensation due Douglas for "honest and forthright" performance of his agency, a duty imposed on every fiduciary. The court's judgment that Douglas is not entitled to the overriding royalty interest is based upon conclusive evidence of his willful breach of fiduciary duty. The court's denial of the override to Douglas is a proper legal consequence of his established infidelity.

▮▮▮ Honest and forthright performance is a covenant implied in every contract. *Voege v. American Sumatra Tobacco Corp.,* 241 F.Supp. 369 (D.C.Del. 1965); 17 AM.JUR.2d *Contracts* sec. 256. But the fiduciary relationship imposes an even more rigorous standard on the agent —"loyalty, good faith and integrity of the strictest kind." *Anderson v. Griffith, supra.* Douglas admits diverting large amounts of Aztec money to his personal use. He acknowledges preparing a bogus account. Aztec's accountant testified that, excluding Douglas' $5,000 compensation and $2,903.34 legitimate leasing expense, $107,874.57 out of the $343,557.36 did not go for the purchase of oil leases. There is ample legally sufficient evidence from which the jury could decide in answer to Special Issue No. 2 that Douglas willfully misappropriated that sum. The evidence is uncontroverted that he failed to account for it. We therefore overrule appellant's points one through five.

▮▮▮ In his sixth and seventh points of error Douglas seeks to set aside the jury's award of exemplary damages arguing that exemplary damages are not recoverable for breach of contract. However, punitive damages are proper when a coincident tort is pleaded and proven. *International Bankers Life v. Holloway,* 368 S.W.2d 567 (Tex.1963); *Briggs v. Rodriguez,* 236 S.W.2d 510 (Tex.Civ.App.—San Antonio 1951, writ ref'd n.r.e.). In *International Bankers Life v. Holloway, supra,* our Supreme Court dealt with the case of a defaulting fiduciary against whom exemplary damages had been assessed. In answering the appellant's argument that punitive damages cannot be based on breach of contract, the court recognized that the rule had been restricted to those instances where the breach of contract did not also constitute a willful tort. *International Bankers Life v. Holloway, supra* at 583. The Supreme Court's rationale is equally applicable here: "We should not say to defaulting fiduciaries that the most for which they can be held accountable in equity are the profits which would have remained theirs had they not been called to account." *International Bankers Life v. Holloway, supra* at p. 584.

▮▮▮ Aztec alleged and conclusively proved breach of fiduciary duty, a tort justifying the award of exemplary damages. *International Bankers Life v. Holloway,*

*supra; City of Fort Worth v. Pippen, supra; Crutcher-Rolfs-Cummings Inc. v. Ballard, supra; Christopher v. General Computer Systems, Inc.,* 560 S.W.2d 698 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r. e.); *Russell v. Truitt, supra.* Therefore we hold the trial court did not err in awarding exemplary damages as found by the jury, and we overrule appellant's points six and seven.

The judgment of the trial court is affirmed.