workerscompfacility 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00089-CV







The Texas Workers' Compensation Insurance Facility, Appellant



v.



Personnel Services, Inc., Frederick B. James, and Anthony Morelos, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 91-16599-B, HONORABLE PETER M. LOWRY, JUDGE PRESIDING



 

 The Texas Workers' Compensation Insurance Facility (the "Facility") sought
damages from Personnel Services, Inc. ("PSI"), an employee leasing company, alleging that PSI
misrepresented its status as the employer of leased workers in order to procure lower workers'
compensation insurance rates for its client companies. The trial court found that PSI had
misrepresented that the leased workers were its employees, when in fact the employees remained
under the control and direction of PSI's client companies. Nevertheless, the court rendered a
take-nothing judgment in favor of PSI based on the affirmative defenses of waiver, ratification,
and estoppel. (1) The Facility complains of this ruling in fourteen points of error. PSI brings one
cross-point urging that the trial court erred in finding that the leased workers were not PSI's
employees. We will reverse the trial court's holding that waiver, estoppel, or ratification bar the
Facility's recovery and will overrule PSI's cross-point. 



BACKGROUND


 Concerned that the staff leasing industry permitted certain businesses to avoid
paying proper rates for workers' compensation insurance, the former State Board of Insurance
(now the Department of Insurance) amended its rules in October 1991 to change the definition of
employment as that term is used to calculate workers' compensation premiums in an employee
leasing arrangement ("old rule 9"). See 16 Tex. Reg. 5206 (1991). (2) In cause No. 91-16599,
numerous staff leasing companies, including PSI, challenged the Board's authority to enact old
rule 9. The trial court temporarily enjoined the application of the rule, holding that the staff
leasing companies had shown a probable right of recovery on the theory that the rule affected
coverage and thus exceeded the Board's authority. (3) In that proceeding, the Facility filed a
counter-claim against the staff leasing companies, alleging fraud among other causes of action. 
The Facility's counter-claim against PSI was severed into this cause No. 91-16599-B and tried to
the court.

 At all times pertinent to this lawsuit, the Facility was the insurer of last resort for
employers unable to obtain workers' compensation coverage through private insurance
companies. (4) The Facility was required to provide insurance coverage for any risk rejected by the
voluntary market if that risk appeared to be "in good faith entitled to insurance." Tex. Ins. Code
Ann. art. 5.76-2, § 4.02(b) (West Supp. 1995). "Good faith" is defined as "honesty in fact in any
conduct or transaction." Id. art. 5.76-2, § 1.01(8), art. 5.76-4(d). The trial court concluded that
PSI had a statutory duty to be honest in any conduct or transaction with the Facility.



WORKERS' COMPENSATION SYSTEM


 Two factors are used to account for risk in the premium calculation for workers'
compensation insurance: (1) employees are classified according to the risks involved with the
work performed (e.g., roofers are assigned a higher risk factor than carpenters); and (2) the
employer is rated according to its history of claims filed. The employer's rating based on its loss
history is called an experience modifier. An employer with few claims will have a better
experience rating and pay lower premiums than an employer with many claims and a poor
experience rating. This classification of employers operates as an incentive to promote safety and
also assigns costs of coverage based on the historical workplace risk encountered. The employer
with a good loss history receives a credit modifier, i.e., a multiplier less than 1.0 that reduces the
premium for workers' compensation insurance. The employer with frequent job-related claims
is penalized and is assigned a multiplier greater than 1.0, or debit modifier, which increases the
standard premium. A new business with no loss history is assigned the neutral modifier of 1.0
and pays the standard premiums.

 Premium rates based on employee job classification are listed in the Texas Basic
Manual of Rules, Classifications and Rates for Workers' Compensation and Employers' Liability. 
The employer's work force is classified according to this schedule to determine the standard
premium. This standard premium amount is then multiplied by the employer's experience
modifier.

 Before November 1992, the Department of Insurance relied on employment status
to identify the appropriate loss history and experience modifier for calculating a worker's
compensation premiums. (5)
 The employee leasing industry saw an opportunity to offer relief to
businesses penalized for excessive claims: for a fee, the leasing company would "employ" the
workers and then "lease" them back to the client company. For example, assume an employee
leasing company, as a new business, has a modifier of 1.0 while the client company has earned
a debit modifier of 2.0. If the client company applies as the employer, it will pay twice the
standard premium for insurance on its workers. If the leasing company applies to the Facility as
the employer of the same workers, which it then leases to the business with the history of bad
claims, the leasing company is charged only the standard premium. The employee leasing
arrangement reduces the insurance premium by fifty percent, but also subverts the Department's
scheme to include the risk factor of a hazardous workplace in the insurance rate.



PSI'S FRAUD AND ITS AFFIRMATIVE DEFENSES


 The first question presented in this appeal is whether PSI legally or illegally
thwarted the Department's rate-making scheme for workers' compensation insurance, causing the
Facility to provide insurance in excess of the risk for which it received premiums. If we
determine that PSI's employee leasing scheme was fraudulent, we must ask whether the Facility
had sufficient knowledge of the fraud to bar the Facility's recovery of damages. PSI insists that
its staff leasing business was not fraudulent but merely took advantage of a "legal loophole." 
Furthermore, it argues that the Facility knew that PSI, like most staff leasing companies, was not
the actual employer of its leased workers. By providing insurance when PSI represented that it
was the employer and by renewing the policies year after year, PSI argues that the Facility ratified
the arrangement, waived its complaints, and is now estopped from recovering for PSI's fraud, if
any. The Facility responds that it had only general knowledge of the nature and activities of the
staff leasing industry and PSI, and that this general knowledge does not operate to bar its recovery
for PSI's specific fraud, which exposed the Facility to risks in excess of the premiums received.

 Before the enactment of new rule 9 in November 1992, employer status determined
the proper experience modifier to apply in calculating workers' compensation premiums; this
system exposed the entire workers' compensation program to potential abuse by employee leasing
arrangements. (6) Although this "loophole" existed under old rule 9, the loophole was legal only
for those who truly exercised sufficient control to become employers. The fact that staff leasing
arrangements in general presented opportunities for businesses to avoid the Department's risk-oriented rate system did not make each leasing arrangement fraudulent. Some leasing companies
may have exercised sufficient control over leased workers to qualify as employers if their client
companies actually surrendered enough control over these workers to legally avoid their high debit
modifiers. However, it was never legal to represent to carriers or to the Facility that the employer
status had shifted when in fact it had not. Having designed its employee leasing arrangements to
take advantage of a scheme based on employment status, the legality of PSI's actions must be
measured by its success in assuming the role of employer.

 In Newspapers, Inc. v. Love, 380 S.W.2d 582, 590-91 (Tex. 1964), the supreme
court held that the test for determining whether an individual is an employee is the right to control
the details of that person's work. Many of the contracts between PSI and its client companies
were silent on the issue of control; others disguised the real employment relationship. A contract
that is a mere sham designed to conceal the true legal relationship between the parties will not
control employment status. Exxon Corp. v. Perez, 842 S.W.2d 629, 630 (Tex. 1992). The trial
court properly considered the circumstances surrounding the specific relationships between PSI,
the workers, and the client companies to determine who was the employer of the leased workers. 

 The record is replete with evidence to uphold the trial court's findings that (1) PSI's
client companies at all times had and retained the right to control the details of the work of the
leased workers, making them employees of the client company and not employees of PSI; (2) PSI
misrepresented to the Facility that the leased workers were PSI's employees; and (3) PSI intended
that the Facility act upon these material misrepresentations. There is evidence that the client
companies controlled the start and stop times of the workers, the sequencing of the tasks they were
to perform, as well as the hiring, firing and disciplining of the workers. Indeed, there is evidence
that PSI assured the client companies that they would retain complete control over the leased
workers and that the client companies would not have entered into the staff leasing arrangements
absent such assurances. Additional evidence reveals that PSI did not supervise its "on-site
supervisors," who in reality reported directly to the client companies. Because we agree with the
trial court's finding that the leased workers were employees of the client companies and not of
PSI, we overrule PSI's cross-point of error.

 The question remains whether the trial court properly applied the affirmative
defenses of waiver, ratification, and estoppel to bar the Facility's recovery for PSI's fraud. The
Facility asserts that the evidence is both legally and factually insufficient to support the trial
court's findings in favor of PSI's affirmative defenses. An appellant who challenges the legal
sufficiency of the evidence supporting an issue upon which it did not have the burden of proof
must demonstrate that there is no evidence to support the adverse finding. Raw Hide Oil & Gas,
Inc. v. Maxus Exploration Co., 766 S.W.2d 264, 275 (Tex. App.--Amarillo 1988, writ denied). 
In reviewing a no-evidence point, we consider only the evidence supporting the finding and
disregard all evidence to the contrary. Best v. Ryan Auto Group, Inc., 786 S.W.2d 670, 671
(Tex. 1990). If there is any evidence supporting the finding, we must overrule the point and
uphold the finding.

 PSI argues that the Facility is barred because it knew that staff leasing companies
generally and PSI specifically were using the employee leasing arrangement to lower premiums
paid for workers' compensation insurance. As evidence of this knowledge PSI points to the
Board's argument in the hearing to enjoin old rule 9 that without this amendment to its rules, it
was "powerless" to address the use of employee leasing arrangements to avoid its rate-making
scheme. PSI further argues that this suit is nothing more than an attempt to apply new rule 9
retroactively, i.e., to use the experience modifier of the client company to calculate workers'
compensation premiums for leased workers. We reject these arguments as mere attempts to
expand the "legal loophole" rubric.

 Before it is barred by the affirmative defenses of estoppel, waiver, and ratification,
the Facility must have known specifically that this particular leasing company, in its arrangements
with these specific client companies, did not assert sufficient control to qualify as the employer
of these specific leased workers. The Facility's general awareness that employee leasing
arrangements were being used to save money on workers' compensation premiums is not sufficient
knowledge to bar recovery for one leasing company's specific fraudulent misrepresentations about
the employment status of its leased workers. "One cannot waive or acquiesce in a wrong while
ignorant that it has been committed. Current suspicion and rumor are not enough. There must
be knowledge of the facts which will enable the party to take effectual action. Nothing short of
this will do . . . ." Wells v. Houston, 69 S.W. 183, 188 (Tex. Civ. App. 1902, writ ref'd); see
also Magnolia Petroleum Co. v. Butler, 86 S.W.2d 258, 262 (Tex. Civ. App.--Fort Worth 1935,
writ dism'd w.o.j.). We further note that the Facility will not be charged with the Department
of Insurance's knowledge or awareness of staff leasing arrangements generally or of PSI's
operations specifically. 

 To establish waiver, PSI had to show that the Facility (1) had an existing legal
right, (2) which it knew of at the time of the alleged waiver, and (3) that it intended to relinquish
that right. See Braugh v. Phillips, 557 S.W.2d 155, 158 (Tex. Civ. App--Corpus Christi 1977,
writ ref'd n.r.e.); see also Sun Exploration & Prod. Co. v. Benton, 728 S.W.2d 35, 37 (Tex.
1987). Waiver is a matter of intention. Ford v. Culbertson, 308 S.W.2d 855, 865 (Tex. 1958). 
There is no evidence that with full knowledge of all material facts that constituted the fraud, the
Facility clearly manifested its intention to waive its right to recover for PSI's deception. See
Viracola v. Dallas Int'l Bank, 508 S.W.2d 472, 474-75 (Tex. Civ. App.--Waco 1974, writ ref'd
n.r.e.). Likewise, the Facility did not ratify PSI's actions; there is no evidence that the Facility,
possessing full knowledge of PSI's misrepresentation concerning its status as employer,
consciously decided to issue or renew insurance policies for PSI's leased workers using PSI's
experience modifier. See LSR Joint Venture No. 2 v. Callewart, 837 S.W.2d 693, 699 (Tex.
App.--Dallas 1992, writ denied).

 To invoke the equitable doctrine of estoppel requires "clean hands." Douglas v.
Aztec Petroleum Corp., 695 S.W.2d 312, 317 (Tex. App.--Tyler 1985, no writ). Because of the
Facility's unique status as insurer of last resort, PSI was under a statutory duty to be honest in its
dealings with the Facility. See Tex. Ins. Code art. 5-76-2, § 1.01(8) (West Supp. 1995). Having
misrepresented its status as employer while under a statutory duty to be honest in its dealings with
the Facility, PSI is not in a position to use the equitable doctrine of estoppel to shield itself from
the results of its fraud. See El Paso Nat'l Bank v. Southwest Numismatic Inv. Group, Ltd., 548
S.W.2d 942, 948-49 (Tex. Civ. App.--El Paso 1977, no writ). 

 We conclude that there is no evidence that the Facility had specific knowledge that
PSI intentionally misrepresented its role as employer of the leased workers in question. Absent
specific knowledge of PSI's misrepresentations, the trial court erroneously relied on the Facility's
general awareness of the staff leasing industry and its general knowledge of PSI's activities to
apply the affirmative defenses of waiver, ratification, and estoppel as a bar to the Facility's
recovery. Therefore, the trial court erroneously concluded that PSI did not commit fraud against
the Facility. We sustain points of error one through five, ten, and fourteen. Having concluded
that no evidence supports the trial court's findings of the Facility's specific knowledge of PSI's
activities, we need not address the Facility's remaining points of error.



CONCLUSION


 We reverse the take-nothing judgment in favor of PSI and remand this cause to the
trial court for a determination of damages on the Facility's cause of action for fraud.



 

 Bea Ann Smith, Justice

Before Justices Powers, Aboussie and B. A. Smith

Reversed and Remanded

Filed: March 29, 1995

Publish

1.   The trial court's conclusion that "PSI did not commit fraud against [the Facility]" is at
odds with the court's other findings and conclusions. To harmonize the trial court's findings
and conclusions, we interpret the trial court's statement to mean that the Facility was barred
from recovering for PSI's fraud based on PSI's affirmative defenses.
2.   These rules are contained in the Texas Basic Manual of Rules, Classifications and Rates
for Workers' Compensation and Employers' Liability, promulgated by the Department of
Insurance. Although the rules are not published in the Texas Register, the Department of
Insurance gives notice through the Register when new rules or changes to rules are proposed. 
Tex. Ins. Code Ann. § 5.96 (West Supp. 1995).


 Old rule 9 provided in part:


A standard workers' compensation policy purchased by a client company provides
workers' compensation coverage for all workers of the client company, including
its leased workers. A standard workers' compensation policy purchased by an
employee leasing firm provides workers' compensation coverage only for workers
that are not leased to a client company.
3. The trial court's ruling in cause No. 91-16599 was appealed to this Court, but the appeal
was dismissed after the Board withdrew old rule 9.
4. Although created by statute, the Facility is a nonprofit, unincorporated association of
insurers that operates as a governmental body only for purposes of the Open Records and
Open Meetings Acts. Tex. Ins. Code Ann. art. 5.76-2, §§ 2.01, .11 (West Supp. 1995). The
Facility stopped writing workers' compensation insurance on December 31, 1993. See Act of
Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 18.24, 1991 Tex. Gen. Laws 362, 362. On
January 1, 1994, the Texas Workers' Compensation Insurance Fund became the insurer of last
resort for workers' compensation insurance in Texas. Tex. Ins. Code Ann. art. 5.76-4 (West
Supp. 1995).
5. When old rule 9 was enjoined, the Department abandoned employment as a guiding
factor for calculating premiums in an employee leasing arrangement. New rule 9 was drafted
to prevent employee leasing arrangements from circumventing the payment of proper
premiums without reference to who is the employer: the client company's modifier is used for
leased workers regardless of their legal employment status. In fact, the status of the staff
leasing company and client company as co-employers for workers' compensation purposes was
subsequently recognized by statute. Tex. Rev. Civ. Stat. Ann. art. 9104, § 11(c) (West Supp.
1995).

6. The National Council on Compensation Insurance, Inc. recently published a report on
premium fraud in the workers' compensation market:


 

The most significant problem associated with employee leasing is the undermining
of the experience rating system. . . . One consequence of this practice is that
unsafe businesses get discounted premiums which are then shifted, through
increased rates, to safer businesses.


* * *


To the extent that intentional cheating [occurs], honest employers pay three
times--once for their own workers, a second time through higher rates needed to
collect adequate premiums to make up a shortfall created by other employers, and
a third time by losing business to competitors who underpay for their insurance
coverage.



Report of the Fraud Advisory Commission of the National Council on Compensation
Insurance, Inc. 12, 19 (1994).