UBS FINANCIAL SERVICES ET AL. V. BRANTON

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-140-CV

UBS FINANCIAL SERVICES, INC. APPELLANTS

F/K/A UBS PAINEWEBBER, INC.,

UBS GLOBAL ASSET MANAGEMENT, INC., 

KORTNEY PAUL, AND 

WILLIAM RILEY 

V.

BILL BRANTON APPELLEE

------------

FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY

------------

AND

------------

NO. 2-05-156-CV

IN RE UBS FINANCIAL SERVICES, INC. RELATORS

F/K/A UBS PAINEWEBBER, INC.,

UBS GLOBAL ASSET MANAGEMENT, INC., 

KORTNEY PAUL, AND 

WILLIAM RILEY 

------------

ORIGINAL PROCEEDING

------------

OPINION

------------

This is a securities case in which Bill Branton (“Branton”) sued UBS Financial Services., Inc. (f/k/a UBS PaineWebber, Inc.), UBS Global Asset Management, Inc., and two UBS brokers, Kortney J. Paul and William Riley (collectively “UBS,” when appropriate) for various causes of action arising out of brokerage agreements entered into between Branton and UBS.

UBS filed a motion to compel arbitration pursuant to five of the brokerage agreements signed by Branton.  After two evidentiary hearings,
(footnote: 1) the trial court denied UBS’s motion; the trial court’s denial order did not state a reason for the denial, and the court did not make any findings or conclusions either in the order or in a separate document.
(footnote: 2)
 UBS filed an interlocutory appeal, cause no. 2-05-140-CV, asserting arbitration is required under the Texas Arbitration Act (TAA),
(footnote: 3) and filed a mandamus proceeding, cause no. 2-05-156-CV, asserting arbitration is required under the Federal Arbitration Act (FAA).
(footnote: 4)
 We consolidated these proceedings,
(footnote: 5) issued an order in the mandamus proceeding staying all proceedings in the trial court until the mandamus is disposed of, requested a response from Branton in the mandamus proceeding, and heard oral argument in the consolidated proceedings.

We conditionally grant UBS’s requested relief in the mandamus proceeding because we hold the trial court abused its discretion in denying UBS’s motion to compel arbitration under the FAA.  We dismiss the appeal as moot. 

BACKGROUND

In 2000 and 2001, Branton opened several accounts with PaineWebber, Inc. (“PaineWebber”), which was subsequently acquired by UBS.  On November 19, 2003, Branton filed suit against UBS.  The crux of Branton’s claim is that the UBS defendants recommended unsuitable investments for Branton, who subsequently lost $1 million of his $1.8 million investment.  Specifically, Branton alleged breach of fiduciary duty, fraud (statutory and common law), negligent misrepresentation, negligent hiring, and gross negligence.

Based on five account documents signed by Branton, UBS moved to compel arbitration under either the FAA or the TAA and to stay all proceedings in the trial court.

Branton responded to the motion to compel arbitration, asserting numerous objections to the formation, enforceability, and scope of the arbitration agreement.  Branton’s basic argument is that although the boilerplate language of the account documents requires arbitration under the FAA, there was no mutual assent to the terms of the documents and the arbitration provisions are unenforceable.  Branton testified that when he signed these documents, all of the personal information was blank, and when he later received copies of the documents in the mail from his PaineWebber broker, the blanks had been filled in.  Branton also claims he never received a copy of the Master Account Agreement referenced in one of the account documents, Exhibit 2, and which requires arbitration under the FAA.

In this combined appellate proceeding, UBS asserts the right to compel arbitration based upon three of those account documents, Exhibits 2, 4, and 5. 

JURISDICTION OF THE MANDAMUS PROCEEDING
 

A denial of an application to compel arbitration under the TAA is appealable.  
Tex. Civ. Prac. & Rem. Code Ann.
 § 171.098(a)(1) (Vernon 2005). 
 In Texas, a trial court’s denial of arbitration under the FAA may be challenged only by mandamus and not by interlocutory appeal.  
In re D. Wilson Constr. Co
., 196 S.W.3d 774, 779 (Tex. 2006) (orig. proceeding); 
Jack B. Anglin Co. v. Tipps
, 842 S.W.2d 266, 272 (Tex. 1992) (orig. proceeding);
 
see
 9 U.S.C. §§ 1-16
.  But a party may seek to enforce an arbitration agreement under both the FAA and TAA if the agreement does not say whether the FAA or TAA applies.  
In re
 
D. Wilson Constr. Co
., 196 S.W.3d at 778-79.  Texas appellate courts have jurisdiction over interlocutory appeals from the denial of arbitration under the TAA only or under both the FAA and TAA.  
Tex. Civ. Prac. & Rem. Code Ann
. § 171.098 (a)(1); 
In re D. Wilson Constr. Co.
, 196 S.W.3d at 778-79
.

The FAA “extends to any contract affecting commerce, as far as the Commerce Clause of the United States Constitution will reach.”  
In re Nexion Health at Humble, Inc.
, 173 S.W.3d 67, 69 (Tex. 2005) (orig. proceeding). 
 All the parties agree that because the transaction between UBS and Branton involves parties from different states and UBS’s business affects interstate commerce, this case must be analyzed under the FAA.  The record reflects that the parties reside in or are headquartered in different states,
(footnote: 6) the contract between the parties pertains to securities transactions that involve interstate commerce,
(footnote: 7) and two of UBS’s account documents, Exhibits 2 and 5, clearly state that disputes will be resolved under the FAA.
(footnote: 8)  Accordingly, we agree with the parties that the dispute between the parties involves arbitration under the FAA; therefore, we will address the merits of our mandamus jurisdiction first.  
See In re D. Wilson Constr. Co.
, 196 S.W.3d at 780.

PROVING ENTITLEMENT TO ARBITRATION UNDER THE FAA

Because this transaction is governed by the FAA, mandamus is an appropriate remedy to enforce the agreement.  
See Jack B. Anglin Co.
, 842 S.W.2d at 272.  
Mandamus relief is available when a trial court erroneously denies a motion to compel arbitration under the FAA.  
In re Dillard Dept. Stores, Inc.
, 186 S.W.3d 514, 515 (Tex. 2006) (orig. proceeding)
; In re FirstMerit Bank, N.A.
, 52 S.W.3d 749, 753-54 (Tex. 2001) (orig. proceeding)
.

Section 2 of the FAA “embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable ‘upon such grounds as exist at law or in equity for the revocation of any contract.’”  
Perry v. Thomas
, 482 U.S. 483, 489, 107 S. Ct. 2520, 2525
 (1987).  
Federal and state law strongly favor arbitration.  
See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.
, 460 U.S. 1, 24-25, 103 S. Ct. 927, 941 (1983); 
Prudential Sec., Inc. v. Marshall
, 909 S.W.2d 896, 898 (Tex. 1995) (orig. proceeding). 
 The FAA establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or a defense to arbitrability.  
Moses H. Cone Mem. Hosp.
, 460 U.S. at 24-25, 103 S. Ct. at 941
.

A party attempting to compel arbitration must establish a valid arbitration agreement whose scope includes the claims asserted.  
In re Dillard Dept. Stores, Inc.
, 186 S.W.3d at 515;
 
In re AdvancedPCS Health L.P.
, 172 S.W.3d 603, 605 (Tex. 2005) (orig. proceeding).  
Under the FAA, an agreement to arbitrate is valid if it meets the requirements of the general contract law of the applicable state.  
In re Advanced PCS Health, 
172 S.W.3d at 606.  Once the proponent of arbitration establishes the existence of an arbitration clause governing a dispute, the burden shifts to the opponent to raise an affirmative defense to arbitration.  
Id.
 at  607.  The defenses must specifically relate to the arbitration portion of the contract, not the contract as a whole, if the defenses are to defeat arbitration.  
In re RLS Legal Solutions, LLC
, 221 S.W.3d 629, 630 (Tex. 2007) (orig. proceeding); 
In re FirstMerit Bank
, 52 S.W.3d at 756
.

Under the FAA, absent unmistakable evidence that the parties intended the contrary, it is the courts rather than arbitrators that must decide “gateway matters” such as whether a valid arbitration agreement exists.  
In re Weekley Homes, L.P
., 180 S.W.3d 127, 130 (Tex. 2005) (orig. proceeding).  
A trial court’s determination of the arbitration agreement’s validity is a legal question subject to de novo review.  
J. M. Davidson, Inc. v. Webster
,  128 S.W.3d 223, 227 (Tex. 2003). 

THE ACCOUNT DOCUMENTS AT ISSUE

UBS contends that Exhibits 2, 4, and 5
(footnote: 9) were signed by Branton and require arbitration under the FAA.  The evidence shows that Branton signed Exhibits 2 and 4 when he opened his account with PaineWebber, and that he signed Exhibit 5 at a later date when he applied for a line of credit.
(footnote: 10)  These exhibits are pre-printed forms with blanks that are to be filled in with various personal information about the customer, including the account number, customer name, address, soc
ial security number, financial information, and investment objectives.

   Exhibit 2 is entitled 
“[Ac]count Application”
 and was signed by Branton on October 17, 2000.
(footnote: 11)  The application contains blanks to be filled in pertaining to the account holder.  These blanks include the account holder’s address, phone number, social security number, date of birth, number of dependents, federal tax bracket, bank reference, marital status, and gender. There is a question asking if the applicant is a PaineWebber employee or is related to a PaineWebber employee.  Under the Financial Information section there are blanks asking for “Worth (exclusive of residence),” “Assets,” and “Income.”
(footnote: 12)  The application also has blanks for the number of years that the account holder has had experience investing in equities, bonds, futures, or options.  Under the “Account Investment Objectives” portion of the application, the account holder is asked to select whether his “Return Objective” is current income, capital appreciation, or current income and capital appreciation.  Also under this section is a “Risk Profile,” and the account holder is asked to select a primary and secondary profile from the following options:  conservative, moderate, or aggressive/speculative.

Above Branton’s signature is a long paragraph that includes the following wording
:

NING
 
BELOW, I ACKNOWLEDGE AND AGREE: . . . 2. that in accordance with the last paragraph of the Master Account Agreement entitled [illegible],” I am agreeing in advance to arbitrate any controversies which may arise with PaineWebber in accordance with the terms outlined therein. . . .
(footnote: 13)

Attached to this document is a printed “
Master Account Agreement
.”  The final section of the Master Account Agreement pertains to arbitration (this paragraph is the same in Exhibits 2, 4, and 5):

ARBITRATION

Arbitration is final and binding on the parties.

The parties are waiving their right to seek remedies in court, including the right to jury trial.

Pre-arbitration discovery is generally more limited than and different from court proceedings.

The arbitrator’s award is not required to include factual findings or legal reasoning and any party’s right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

Client agrees, and by carrying an account for Client the Firm agrees that, 
any and all controversies which may arise
 between the Firm, any of Firm’s employees or agents and Client concerning any account, transaction, dispute or the construction, performance or breach of this or any other agreement, whether entered into prior, on or subsequent to the date hereof, 
shall be determined by arbitration
.  Any arbitration under this agreement shall be held under and pursuant to and 
be governed by the Federal Arbitration Act
, and shall be conducted before an arbitration panel convened by the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc.
   [Emphasis added.]

The section 
continues with various other provisions relating to arbitration. The Master Account Agreement does not have a place for the customer to sign, and is therefore not signed. 

Exhibit 5 is entitled “PAINEWEBBER CREDIT LINE GUARANTY AGREEMENT” and was signed by Branton on May 24, 2001.  At the top of the preprinted form are blanks
 to be completed regarding the title of the “Account being Guaranteed (Credit Line Account)” and the title of the “Guarantor/Collateral Account Name.”  There is a blank for the number of the branch, account number, and broker. The text of section 14 of the document itself (not an attachment) contains the full arbitration paragraphs quoted above. 

Exhibit 4 is entitled “
Traditional IRA Application And Adoption Agreement
” and was signed by Branton on October 17, 2000.  Above his signature is wording that is quoted in UBS’s mandamus petition as requiring arbitration; however, much of this wording is illegible on the original exhibit, even when examined with a strong magnifying glass.  The mandamus petition states that the illegible wording recites that by signing the document, Branton acknowledges that he has received and read the Customer Agreement Disclosure Statement and the Master Account Agreement for IRAs. 
 Attached to Exhibit 4 is a “
Master Account Agreement For IRAs
.”  This latter document contains the same arbitration paragraph as is quoted above in Exhibit 2; the document does not have a place for the customer to sign, and is therefore not signed.

Because much of the wording directly above Branton’s signature on the original of Exhibit 4 is entirely illegible,
(footnote: 14) we cannot say that by signing this document Branton agreed to be bound by the terms of the attached Master Account Agreement For IRAs.  Therefore,  Exhibit 4 does not entitle UBS to proceed to arbitration and we will not discuss it further in this opinion.

THE EVIDENTIARY HEARINGS

Dawn Carter, a Divisional Vice President with UBS and an employee of its predecessor PaineWebber, filed an affidavit in support of UBS’s motion to compel arbitration.  She stated that Exhibits 1-5 are true and correct copies of the documents Branton signed to open his accounts, and “[i]t was the regular course of business for PaineWebber to provide copies [of] these applications and agreements to Mr. Branton after he signed them.” 
 Branton was the only witness to testify at the March 5, 2004 hearing.  He stated that after his broker, Kortney Paul, moved from A.G. Edwards to PaineWebber, Branton met with Paul and another broker, William Riley, at their office.  They advised Branton that they had “different policies and procedures that would be advantageous for me to open an account with them.”  Several weeks later Paul brought Exhibits 2 and 5 to Branton’s house for him to sign so that Branton could open an account; the personal identifying information on the documents was blank.  Branton stated that he did not read anything in the documents and was never told about the arbitration clauses.  When he received copies back from PaineWebber, the blanks had been filled in.  He claims he did not receive a copy of the Master Account Agreement referenced in Exhibit 2 until much later when another UBS broker contacted him and asked him to sign new account agreements.
(footnote: 15)
 At the February 25, 2005 hearing, Branton’s wife testified that when  Paul came by their house with the documents for her husband to sign, Branton signed the documents.  She did not read the account applications and when asked if there was handwriting on the documents when she saw them, she acknowledged that she could not recall whether there was any handwriting on the documents.  When asked if Paul explained any aspects of any arbitration agreement, she replied, “Not in my memory.”  She stated that after Branton signed the forms, Paul took them with him and did not leave any copies with the Brantons.  She acknowledged that she does not open the mail that comes to their home from PaineWebber, so if a Master Account Agreement had been received in the mail, she would not have known it.  Paul testified by video deposition taken ten days before the February 25, 2005 hearing.
(footnote: 16)  He stated that he had been a securities dealer with A.G. Edwards, at which time Branton was his client.  Paul left A.G. Edwards to work at UBS as a securities dealer, and Branton subsequently became his client at UBS in 2000.  Paul left UBS prior to Branton filing the current lawsuit; he no longer works in the securities field.  Paul testified that the accounts he opened for Branton at UBS were the same types of accounts that Branton had at A.G. Edwards.  Paul agreed that he took the UBS account documents to Branton’s house to be signed, and  told Branton the documents needed to be signed because a client had to have a completed account application to open up an account with UBS. Paul stated that Exhibits 2 and 5 were account applications that were signed by Branton to open his accounts.
(footnote: 17)  Paul did not recall whether the blanks in the applications were filled out at the time Branton signed the applications, but stated it would not be standard procedure to have somebody sign a  document that did not have the blanks filled out.  Paul acknowledged that the handwriting in the blanks on Exhibit 2 is his own, and that the handwriting in the blanks on Exhibit 5 is his and his assistant’s.  Paul testified that UBS’s standard procedure was to complete all the information either before meeting with the client, or during the meeting with the client.  He could not specifically recall whether the documents were completed at the time Branton signed them, but stated that it would be “unusual” to have a document signed by a client in blank. 
 Paul testified that it was standard practice that if the client wanted to look through the documents and ask questions, Paul would answer them.  However, Branton did not have any questions about the account documents when he signed them. Paul said that it was standard procedure for his assistant at UBS to mail the customer a copy of whatever document had been signed, along with any attachments, including the Master Account Agreement.

DISCUSSION

Two separate documents, Exhibits 2 and 5, require any controversy between UBS and Branton to proceed to arbitration under the FAA.  Whether these provisions are binding turns on the validity of Branton’s defense that there was no obligation to arbitrate the claims because there was no meeting of the minds when Branton signed the documents.  Branton contends the documents are not binding upon him because there was missing personal information that was later filled in by UBS and this missing information includes material terms necessary to create a meaningful contract, and because UBS failed to timely provide him with the Master Account Agreement that was attached to Exhibit 2.
(footnote: 18) 

UBS responds that the contracts are binding because the information was already filled in at the time of signing by Branton, or even if the missing personal information was filled in by UBS after Branton signed the documents, the information had been provided by Branton and was filled in with his permission, and the missing information was not relevant to whether the arbitration clause was binding on Branton.  UBS also contends that Branton’s defenses to the contract pertain to the entire contract, not to the arbitration clause in particular; therefore, UBS asserts that under the separability doctrine 
the defenses cannot defeat arbitration and the defenses can be arbitrated.  We agree with UBS’s latter assertion. 

Any defenses to the contract brought by Branton must specifically relate to the arbitration clause itself, not the contract as a whole, if they are to defeat arbitration. 
See In re FirstMerit Bank
, 
N.A
.
, 52 S.W.3d at 756.
  Defenses that pertain to the entire contract can be arbitrated.  
See
 
id.
  Because the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration, in this case Branton.  
See id.

Branton does not dispute that he signed Exhibits 2 and 5. 
 Obviously, the parties dispute whether there were any blanks in the forms at the time they were signed by Branton.  While the terms that Branton contends were omitted from and later inserted into the forms could be material to the merits of his claim, they relate to the contract as a whole, not specifically to the preprinted language regarding arbitration.  Branton’s defenses to the contract thus pertain to the entire contract, not to the arbitration clause in particular; therefore, under the separability doctrine 
the defenses cannot defeat arbitration and the defenses can be arbitrated.  
See In re FirstMerit Bank
,
 N.A.,
 52 S.W.3d at 756.

In addition, a contract may validly and expressly incorporate by reference arbitration language of another referenced document.  
See
 
In re D. Wilson Constr. Co.
, 196 S.W.3d at 781 (“Innumerable contracts are consummated every day in Texas that incorporate other documents by reference.  A contractual term is not rendered invalid merely because it exists in a document incorporated by reference, . . . and we agree with the courts of appeals that arbitration-related language is no exception to this rule.” (internal citation omitted)).  
Immediately above Branton’s signature on Exhibit 2 is the statement “that in accordance with the last paragraph of the Master Account Agreement . . . I am agreeing in advance to arbitrate any controversies which may arise with PaineWebber in accordance with the terms outlined therein.”  This statement alerted Branton that Exhibit 2 incorporated an agreement to arbitrate that was in the Master Account Agreement.  
See In re Dallas Peterbilt, Ltd., L.L.P.
, 196 S.W.3d 161, 162-63 (Tex. 2006) (orig. proceeding) (holding that employee’s signature acknowledging he had been provided with and carefully read or been given the opportunity to read separate six-page summary requiring arbitration of work-related claim constituted effective notice because it unequivocally provided employee with knowledge of the arbitration agreement, notwithstanding employee’s claim that he did not receive the summary and was unaware of arbitration requirement)
;  
In re McKinney
, 167 S.W.3d 833, 835 (Tex. 2005) (orig. proceeding).  By signing a contract, a party is presumed to have read and understood its contents. 
 See In re Prudential Co. of Am.
, 148 S.W.3d 124, 134 (Tex. 2004) (orig. proceeding).
(footnote: 19)  
Accordingly, UBS met its initial burden of establishing that a valid arbitration agreement exists between UBS and Branton.

UBS also had the burden of showing that the dispute falls within the scope of the arbitration agreement.  
See 
In re Dallas Peterbilt
, 196 S.W.3d at 163.  Branton sued UBS for
 various causes of action arising out of the brokerage agreements entered into between Branton and UBS.  Exhibit 2 recites that by signing the document Branton acknowledged and agreed in advance to arbitrate “any controversies which may arise with PaineWebber in accordance with the terms outlined therein.”  The Master Account Agreement that is referenced in Exhibit 2, recites that the client agrees that “any and all controversies which may arise between the Firm, any of the Firm’s employees or agents and Client concerning any account, transaction, dispute or the construction, performance or breach of this or any other agreement, whether entered into prior, on or subsequent to the date hereof” shall be determined by arbitration.  And Exhibit 5, the Credit Line Guaranty Agreement signed by Branton,
 recites that the client agrees that “any and all controversies which may arise between the parties herein and the Firm concerning any account, transaction, dispute or the construction, performance, or breach of this or any other Agreement, whether entered into prior, on or subsequent to the date hereof” shall be determined by arbitration.  We conclude that the causes of action asserted by Branton in the underlying suit against UBS all arise out of the relationship between Branton and UBS that is encompassed within the scope of the arbitration provisions listed in Exhibit 2, including the Master Account Agreement, and Exhibit 5.

Considering these circumstances, the only decision that the trial court could have reasonably reached was that Branton, by signing Exhibits 2 and 5, had consented to arbitrate future disputes.  
See Walker v. Packer
, 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding) (“clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion”).

CONCLUSION

A party denied the right to arbitrate under the FAA has no adequate remedy by appeal and is entitled to mandamus relief.  
In re AdvancePCS Health L.P.
, 172 S.W.3d at 608; 
In re Wood
, 140 S.W.3d 367, 370 (Tex. 2004) (orig. proceeding).  We conclude that the trial court clearly abused its discretion in denying UBS’s motion to compel arbitration and stay the trial court proceedings.  We conditionally grant mandamus relief.  We have confidence that the trial court will vacate its prior order and will grant UBS’s motion to compel arbitration under the FAA and stay the trial court proceedings.  The writ of mandamus will issue only if the trial court fails to do so.  UBS’s interlocutory appeal is dismissed as moot.  
See
 
Tex. R. App. P.
 43.2(f); 
In re D. Wilson Constr. Co.
, 196 S.W.3d at 784.

DIXON W. HOLMAN

JUSTICE

PANEL B:  HOLMAN, GARDNER, and McCOY, JJ.

DELIVERED:  October 25, 2007

FOOTNOTES
1:
The hearings were held on March 5, 2004 and February 25, 2005.  After the first hearing, the trial court ordered the parties to mediation, which was unsuccessful.

2:
Although Branton’s mandamus response states that “the trial court found no meeting of the minds, therefore, no contract,” the trial court did not make any findings or explanations in support of its denial of UBS’s motion to compel arbitration.

3:
See 
Tex. Civ. Prac. & Rem. Code Ann.
 § 171.021 (Vernon 2005).

4:
See 
9 U.S.C.A. §§ 1-16 (West 1999 & Supp. 2007)
.

5:
See 
In re Valero Energy Corp.
, 968 S.W.2d 916, 916-17 (Tex. 1998) (orig. proceeding) (“We note for future cases that the better course of action for a court of appeals confronted with an interlocutory appeal and a mandamus proceeding seeking to compel arbitration would be to consolidate the two proceedings and render a decision disposing of both simultaneously, thereby conserving judicial resources and the resources of the parties.”).

6:
UBS Financial Services, Inc. and UBS Global Asset Management, Inc. are headquartered in New Jersey.  Kortney Paul, William Riley, and Bill Branton are Texas residents.

7:
The sale of securities affects interstate commerce.  
See Am. Med. Technologies, Inc. v. Miller
, 149 S.W.3d 265, 269 (Tex. App.—Houston [14th Dist.] 2004, no pet.)(combining mandamus and interlocutory appeal); 
In re Merrill Lynch, Pierce, Fenner & Smith Inc.
, 131 S.W.3d 709, 712 (Tex. App.—Dallas 2004, orig. proceeding).

8:
As will be discussed 
infra
, UBS’s Exhibit 4 cannot support its request that the dispute between the parties be sent to arbitration.

9:
The numerous documents allegedly signed by Branton appear in several places in the clerk’s record and some were entered into evidence at the two evidentiary hearings.  As a result, the same document may bear a different exhibit number depending upon where it is located in the appellate record.  We ordered the originals of UBS’s Exhibits 2, 4, and 5 from the March 5, 2004 hearing on UBS’s motion to compel be sent to this court as part of the consolidated appellate record.  
See
 
Tex. R. App. P.
 34.6(g)(2).  These are the three documents upon which UBS relies in this appellate proceeding.  Accordingly, we will refer to the three exhibits at issue by their designation at the March 5, 2004 hearing:  Exhibits 2, 4, and 5. 

10:
Branton does not dispute that he signed these documents. 

11:
We have closely examined the original of Exhibit 2 that was introduced in the trial court.  This document is actually a photocopy of the application that was signed by Branton. It appears that when the original application was photocopied, a small portion of the entire vertical left margin was omitted. Therefore, Exhibit 2 lacks several letters or words in the left margin.  However, these omissions do not affect the specific issue before us.  

12:
It is probable that these are incomplete phrases; however, because the left margin of the document is missing, we are unable to ascertain the exact wording of the phrases.

13:
As explained previously, because of the quality of the exhibit it is not possible to ascertain the first word(s) of the quoted material or one of the words within the quote. 

14:
UBS also quotes language from Exhibit 4 which UBS says recites that by signing the document Branton affirms that he has supplied all of the information contained in the agreement and declared it to be true and correct. Some of this wording is legible on the exhibit.  However, we will not consider these fragments of sentences because the complete phrase or sentence containing this wording cannot be ascertained from a close reading of the original of Exhibit 4.

15: After UBS acquired PaineWebber, a UBS broker presented Branton with UBS’s account forms and requested that Branton sign them.  Branton testified he did not sign the new documents.

16:
The court watched the deposition and the court reporter transcribed it. The actual video deposition was not introduced into evidence.

17:
Paul was asked about “Deposition Exhibits” 1 and 3.  There are no deposition exhibits included in the appellate record.  However, a review of Paul’s testimony indicates that Deposition Exhibit 1 appears to be the same as Exhibit 2 referred to in our opinion, and Deposition Exhibit 3 appears to be the same as Exhibit 5 referred to in our opinion.

18:
However, as stated earlier in this opinion, Exhibit 5 was signed by Branton and does not purport to have any attachments—the arbitration clause is actually in the text of the document itself.

19:
Because we reject this argument, we also reject Branton’s argument that there was no valid contract because the Master Account Agreement had not been “delivered” to him.