COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-289-CV

 

 

INIMITABLE GROUP, L.P.                                                    APPELLANTS

AND
SOITIS, L.L.C.

                                                   V.

 

WESTWOOD GROUP

DEVELOPMENT II, LTD.                                                           APPELLEE

 

                                              ------------

 

            FROM
THE 48TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

                                            Introduction








This case involves a dispute
over whether a contract for the construction and sale of an office and
warehouse building was validly terminated by the purchaser before closing.  In five issues, appellants Inimitable Group,
L.P. and Soitis, L.L.C. challenge (1) the trial court=s determination that they did not validly terminate the contract and,
consequently, (2) the trial court=s final judgment awarding damages to appellee Westwood Group
Development II, Ltd. for breach of contract. 
We affirm.

                                            Background








In February 2005, Soitis and
Westwood entered into an Agreement of Purchase and Sale (Agreement) Ato provide for the construction by@ WestwoodCand the
subsequent sale to SoitisCof an office
and warehouse building in Grapevine, Texas. 
The Agreement provided for the building to be constructed according to
certain plans and specifications, which were attached as exhibits.  The initial closing date was to be October
30, 2005.  The date the building was to
be substantially completed as defined in the Agreement was October 15, 2005, Aas adjusted from time to time as expressly provided@ in the Agreement.  The
Agreement further (1) provided that A[t]ime is of the essence,@ (2) required Westwood to construct the building with due diligence on
or before the substantial completion date, Aas extended by Excusable Delays and/or Purchaser Delays,@ both defined in the Agreement,[1]
and (3) allowed Soitis to terminate the agreement by written notice to Westwood
if substantial completion had not occurred by December 31, 2005 Aas extended by Purchaser Delays only and Excusable Delays.@

The construction plans
attached to the Agreement provided only for the construction of the exterior of
the building; Soitis was responsible for its own interior finish-out.  Construction on the building began in late
March 2005.  In April 2005, Soitis and
Westwood agreed that Westwood would assist Soitis in designing the interior
finish-out of the building.  Westwood
hired an architect to assist with the interior finish-out plans.

From April through November
2005, Tony Robertson, Soitis=s president, and Nicole Meadors, a Westwood employee, corresponded by
phone and email regarding various aspects of the interior and exterior design
and construction of the building.  Al
Burtin, Westwood=s chief
operating officer, also participated in the process.  Soitis requested several alterations to the
original exterior design, including the relocation of a truck ramp, the
addition of a window, and the addition of a hard coat texture to the
exterior.  After reviewing and making
several changes to the architect=s proposed drawings, Robertson approved the initial interior
finish-out plans on June 21, 2005.  He
approved the final construction documents for the interior on September 14,
2005, which Westwood then sent out for bids on the construction costs.








On November 7, 2005, the day
Westwood received at least one of the bids for the interior construction,
Robertson and Meadors had a phone conversation about the project, after which
Meadors sent Robertson an email stating, AI was curious to hear if you had found anything else out?  We have put your building on hold, but need
to know ASAP exactly what direction we are going to be heading in.@  Two days later, on November 9,
2005, Robertson, Burtin, and Meadors met regarding the project, and Robertson
informed Meadors and Burtin that Soitis did not intend to occupy the
building.  They discussed options for the
project, including having Soitis continue with the purchase and lease or sell
the building.  In addition, Robertson
asked Meadors to investigate whether a different buyer could be found for the
project.  Robertson told Meadors and
Burtin that he wanted to get a new appraisal on the building.  Robertson=s notes from that meeting indicate, AAnticipate a closing on December 1st,@ and contain a notation that appears to state that the architect=s costs were approximately $25,000. 
The meeting notes also appear to contain calculations of the costs to
either lease or sell the building in both improved and unimproved condition.








Despite Robertson=s November 7, 2005 instruction to stop work on the building, Westwood=s contractor continued construction according to its contract with
Westwood.  As of December 13, 2005, the
only item remaining to be completed was the addition of an exterior wall light,
needed to replace a planned but not installed light pole that the architect had
inadvertently located over a gas line.

On December 14, 2005, Meadors
sent Robertson an email stating,

We are still trying to sell
your building[;] our prospect cannot meet until after the first of the year . .
. so I will keep you informed.  As far as
closing on your building, we want to close after Christmas but before the New
Year.  Can you have all of your financing
in place by this time?  

Robertson responded, AHaving the financing in place is not a problem.  Organizing our side for a closing in the
middle of the holiday week is going to be a problem.  The way things stand now, we are all out on
vacation.  We can try to figure something
out this afternoon.@  Meadors sent Robertson an email on January 9,
2006 inquiring whether Soitis Ahad gotten anything scheduled for [the] building@ and asking him to email her Aan update so we can get a closing date set.@  Robertson responded, 

I
forwarded the information to Chase last Thursday.  My contact assured me they would evaluate the
appraiser to determine if they could use him in our situation.  I think you are correct, that this would be
the most effective way to get us the appraisal we want in the shortest time. .
. .  I will be talking with Chase
tomorrow at the latest. 

 








Burtin finally sent Robertson
an email on January 27, 2006, stating that Westwood wanted to schedule closing
for February 6, 2006.  Burtin went on to
state that the building had been substantially completed on November 30, 2005
and that the construction had run over schedule because of the changes to the
exterior plans requested by Soitis, Anone of which [according to Burtin] pertained to the seller=s actions.@  Soitis did not challenge Burtin=s contention that it was the cause of the construction delay.

On January 31, 2006, Meadors
sent Robertson an email noting that he had told her Soitis was Achanging the name on the [Agreement] from Soitis to another entity@ and asking the name so that an assignment could be drafted.  Soitis formed Inimitable in February 2006 and
assigned its rights under the Agreement to Inimitable.  According to Steve Staneff, Soitis=s former president and an equity holder, Inimitable was formed for the
sole purpose of purchasing the building as an investment with the intent to
lease it back to Soitis.[2]








Robertson and Meadors
continued to correspond regarding closing, with Meadors attempting to schedule
a February 15, 2006 closing.  Robertson
told her that he would Amake every
effort for 2:00 on the 15th, [but] the 16th would be easier.@  He also stated that he Awould like to wrap this up as well.@  Meadors met with the new
appraiser on February 6, 2006.  However,
unbeknownst to Westwood, Robertson, had already begun looking at the Agreement
to determine if Inimitable could terminate the transaction.  Accordingly, sometime during the time he was
discussing closing with Meadors, Robertson was discussing termination options
with counsel.  After confirming that the
City had not issued a certificate of occupancy for the building exterior
because the wall light had not been installed, appellants= counsel sent a letter to Westwood terminating the Agreement under
section 6.3, which allowed the buyer to terminate if the building had not been
substantially completed by December 31, 2005. 
In the letter, counsel also demanded that Westwood return the $50,000
earnest money Soitis had paid into escrow when it first entered into the
Agreement.








After Westwood refused to
return the earnest money, appellants sued Westwood in March 2006, claiming that
Inimitable had validly terminated the Agreement and seeking return of the
earnest money as damages for breach of contract.  They also sought a declaratory judgment that
the Agreement is Aterminated,
invalid, void, and/or unenforceable.@  Westwood asserted
counterclaims for breach of contract, negligence, and quantum meruit.  In its Third Amended Original Answer,
Westwood also included specific denials, claiming, among other things, that all
conditions precedent to appellants= right to relief had not occurred: 
specifically, that appellants prevented Westwood from performing the
Agreement by instructing it to stop construction on the building.  Westwood also pled the affirmative defenses
of appellants= breach and
failure to perform, anticipatory repudiation, waiver, promissory and equitable
estoppel, laches and unclean hands, and impossibility or impracticality of
performance.

After a bench trial on
January 16, 2007, the trial court ruled in favor of Westwood, awarding it
damages of $157,946 plus prejudgment interest of $13,209.05Ca total of $171,155.05Cfor breach of contract.  It also
awarded Westwood $65,000 in trial attorney=s fees and conditional attorney=s fees on appeal for $20,000 each to an appeal to the court of appeals
and a fully briefed appeal in the supreme court.  It also split costs between Inimitable and
Soitis.  The trial court signed findings
of fact and conclusions of law on October 18, 2007.

                                         Issues
on Appeal








Appellants
bring five issues on appeal, in which they challenge the following findings and
conclusions of the trial court:  (1) that
Soitis and Westwood entered into a second, oral agreement for Westwood to
coordinate the interior design of the building, (2) that Soitis either
anticipatorily repudiated or breached the second, oral agreement, or both, by
failing to execute change orders incorporating the interior design work into
the Agreement, (3) that Westwood was excused from performance under the
Agreement after Soitis=s
anticipatory repudiation, breach, or both of the second, oral agreement, (4)
that Soitis should be estopped from claiming Westwood breached the Agreement,
and (5) that Soitis waived any failure by Westwood to comply with the
Agreement.

                                       Standard of Review

Findings of fact entered in a
case tried to the court have the same force and dignity as a jury=s answers to jury questions.  Anderson
v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991).  The trial court=s findings of fact are reviewable for legal and factual sufficiency of
the evidence to support them by the same standards that are applied in
reviewing evidence supporting a jury=s answer.  Ortiz v. Jones,
917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881 S.W.2d 295,
297 (Tex. 1994).  A court of appeals
cannot make original findings of fact; it can only Aunfind@ facts.  Tex. Nat=l Bank v. Karnes, 717 S.W.2d 901, 903
(Tex. 1986); Zeptner v. Zeptner, 111 S.W.3d 727, 734 (Tex. App.CFort Worth 2003, no pet.) (op. on reh=g).

Conclusions of law may not be
challenged for factual sufficiency, but they may be reviewed to determine their
correctness based upon the facts.  Citizens
Nat=l Bank v.
City of Rhome, 201 S.W.3d 254, 256 (Tex.
App.CFort Worth 2006, no pet.); Dominey v. Unknown Heirs and Legal
Representatives of Lokomski, 172 S.W.3d 67, 71 (Tex. App.CFort Worth 2005, no pet.).








                   Existence of Oral Agreement for Interior
Finish-out

In their first issue,
appellants contend that the trial court incorrectly concluded that Soitis and
Westwood entered into a valid, binding second agreement for the interior
finish-out of the building because there is no evidence that the terms of such
an agreement were sufficiently definite so as to be enforceable.  In their second issue, appellants contend that
because there is no evidence of an enforceable second agreement, they cannot
have anticipatorily repudiated it.

Whether an agreement is
legally enforceable or binding is a question of law.  Searcy v. DDA, Inc., 201 S.W.3d 319,
322 (Tex. App.CDallas 2006,
no pet.); Oakrock Exploration Co. v. Killam, 87 S.W.3d 685, 690 (Tex.
App.CSan Antonio 2002, pet. denied). 
To be enforceable, a contract must be sufficiently definite in its material
terms so as to enable the court to ascertain the parties= intentions.  Fort Worth ISD
v. City of Fort Worth, 22 S.W.3d 831, 846 (Tex. 2000); T.O. Stanley Boot
Co. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992).  What terms are Amaterial@ to a
contract should be determined on an agreement‑by‑agreement
basis.  T.O. Stanley Boot Co., 847
S.W.2d at 221 (AEach
contract should be considered separately to determine its material terms.@).  When an essential term is
left open for future negotiation, there is no binding contract.  Id.








The terms of an oral
agreement may be established by direct or circumstantial evidence.  Harris v. Balderas, 27 S.W.3d 71, 77
(Tex. App.CSan Antonio
2000, pet. denied).  In determining
whether an oral contract exists, we Alook to the communications between the parties and to the acts and
circumstances surrounding those communications.@  Id.

Appellants contend that they
cannot have entered into an enforceable agreement for the interior finish-out
because there was no agreed upon fee for Westwood=s servicesCand thus no
way to determine the final cost of the agreementCa0nd no agreed upon due date for the finished product.








When a contract does not set
forth a definite price but all other elements of a contract have been met, the
trial court may imply a reasonable price. 
KW Constr. v. Stephens & Sons Concrete Contractors, Inc., 165
S.W.3d 874, 883B84 (Tex.
App.CTexarkana 2005, pet. denied); Buxani v. Nussbaum, 940 S.W.2d
350, 353 (Tex. App.CSan Antonio
1997, no writ).  Thus, when the parties
have done everything else necessary to make a binding agreement for services,
their failure to specify a price does not leave the contract so incomplete that
it cannot be enforced.  KW Constr.,
165 S.W.3d at 884; Burnside Air Conditioning & Heating, Inc. v. T.S.
Young Corp., 113 S.W.3d 889, 894B95 (Tex. App.CDallas 2003,
no pet.); Pennington v. Jerry F. Gurkoff, D.O., P.A., 899 S.W.2d 767,
770 (Tex. App.CFort Worth
1995, writ denied).

Additionally, the absence of
a duration term for a contract Adoes not necessarily suggest that the parties did not enter into an
enforceable agreement.@  Cytogenix, Inc. v. Waldroff, 213
S.W.3d 479, 486 (Tex. App.CHouston [1st Dist.] 2006, pet. denied); Avila v. Gonzalez, 974
S.W.2d 237, 244 (Tex. App.CSan Antonio 1998, pet. denied) (noting that, A[w]hen the duration of a contract is not expressly dictated by the
agreement, courts will frequently presume that the parties intended the
agreement to last for a reasonable time@).  If no time for performance
is stated in the contract, the law may imply a reasonable one if the contract
is Asufficiently definite for a court to be able to fix the time when it
can be enforced.@  Moore v. Dilworth, 142 Tex. 538, 179
S.W.2d 940, 942 (1944); Cytogenix, 213 S.W.3d at 486; Avila, 974
S.W.2d at 245 (noting that reasonable duration may be implied Ain cases where the agreement contemplates that one party will make
substantial expenditures or other investments in accordance with performance@).








Here, Robertson testified
that Soitis and Westwood had an oral agreement for Westwood to engage the
architect to provide interior design services for the project.  Robertson signed off on initial drawings and
on final construction documents prepared by the architect for that
purpose.  He was actively engaged in the
design process, making comments to the drawings and suggesting revisions based
on Soitis=s specific
needs.  When Westwood=s counsel asked him at trial whether he had agreed to pay Westwood for
its expenses in engaging the architect, Robertson said, AYes.@

Burtin testified about the
process by which Westwood and Soitis entered into their oral agreement
regarding the interior finish-out of the building.  He explained as follows:

Here=s how the process works:  We . . . talked about okay, yes, our willingness
to fill that role.  And then what we
typically do with every person, with every client, is we go through the process
of design.

 

Then after design is signed off on, then we go
through the process of obtaining construction documents.  And then after the construction documents are
acquired, then they have to be bid out. 
And then we go through the selection of the bidding process to get the
best contractor.  And then that is
awarded to that best contractor, and then we know a price at that point in
time.

 

He explained that it is impossible to determine a
final price for the interior finish-out until the entire process is
complete.  However, he did testify
regarding expenses that

we
would go through this process and get to a point where we have a number.  And then at that point in time, we will add a
margin on top of the best bid number. 
And then that is the number that we will use to add to the different
expanded scope of work which was requested of us. 

 








Thus, Burtin=s testimony corroborates Robertson=s that Soitis agreed to at least reimburse Westwood for its expenses
related to providing the interior design services.  Accordingly, we do not believe that the agreement
was indefinite for failure to provide a final, agreed upon price for those
services.  See Buxani, 940 S.W.2d
at 353.

Moreover, we do not believe
that the agreement is unenforceable for lack of a specific term for completion
of the services.  Burtin testified that
Westwood representatives explained the interior design and construction process
to Soitis, and the parties were actively engaged in the design process
throughout the summer while the exterior shell construction was ongoing.  The trial court found that Soitis initially
intended to occupy the building and that it could save time and money by
working on the interior finish-out during construction of the exterior as
opposed to waiting until the exterior was completed before beginning the interior
finish-out; appellants do not challenge that finding.  Thus, the trial court impliedly found that
Soitis intended for the interior finish-out to be completed within a reasonable
time after construction of, and closing on, the exterior part of the building,
so as to provide Soitis with the maximum savings of time and money.








Based on the foregoing, we
conclude and hold that the trial court did not err by determining that Soitis
and Westwood entered into an enforceable oral agreement for the interior
finish-out of the building.  We overrule
appellants= first
issue.  Because appellants= second issueCwhether the
trial court erred by determining that appellants anticipatorily repudiated the
interior finish-out agreementCis contingent upon their argument that the oral agreement was
unenforceable, we overrule their second issue as well.

                 Whether
Westwood Excused from Performing Under

                              Agreement
of Purchase and Sale

 

In their third issue,
appellants contend that the trial court erred by concluding that Westwood was
excused from performing under the Agreement after appellants either
anticipatorily repudiated or breached the second agreement for interior design
services, or both.








If, after a party breaches a
contract, the other party continues to insist on performance by the defaulting
party, the nondefaulting party is not excused from performing its part of the
contract as a result of the defaulting party=s breach; the contract continues in force for the benefit of both
parties.  Kennedy Ship & Repair
L.P. v. Pham, 210 S.W.3d 11, 25 (Tex. App.CHouston [14th Dist.] 2006, no pet.); Houston Belt & Terminal
Ry. v. J. Weingarten, Inc., 421 S.W.2d 431, 435 (Tex. Civ. App.CHouston [1st Dist.] 1967, writ ref=d n.r.e.).  Thus, when one party
materially breaches a contract, the nondefaulting party is forced to elect
between two courses of action, i.e., continuing performance or ceasing
performance.  Pham, 210 S.W.3d at
25; Chilton Ins. Co. v. Pate & Pate Enters., Inc., 930 S.W.2d 877,
887B88 (Tex. App.CSan Antonio
1996, writ denied).  Treating the
contract as continuing after a breach deprives the nondefaulting party of any
excuse for terminating its own performance. 
Pham, 210 S.W.3d at 25; Chilton Ins., 930 S.W.2d at 888.








According to appellants,
Westwood failed to elect which remedy it wished to pursue against
appellants:  either (1) insist on
performance and remain bound by all terms of the Agreement or (2) treat
appellants= actions as
a breach and eschew any performance by appellants; in other words, appellants
contend that by continuing to seek closing on the exterior, Westwood
consciously decided to forego the benefit of being able to claim a prior breach
of the Agreement by appellants. 
Appellants= did not
raise this argument at trial or in their pleadings, nor did they try it by
consent.[3]  Mastin v. Mastin, 70 S.W.3d 148, 154
(Tex. App.CSan Antonio
2001, no pet.) (ATrial by
consent is intended to cover the exceptional case where it clearly appears from
the record as a whole that the parties tried the unplead issue.@).  Because appellants= argument is in the nature of an avoidance to Westwood=s affirmative defense of excuse, it too is an affirmative defense that
appellants were required to plead.  TEX. R. CIV. P. 94; Compass Bank v. MFP Fin. Servs, Inc., 152 S.W.3d 844,
852 (Tex. App.CDallas 2005,
pet. denied).  Because they did not do
so, they are not entitled to rely on Westwood=s alleged failure to elect its remedies to support reversal of the
judgment on appeal.  Compass Bank,
152 S.W.3d at 852, 857.

Moreover, appellants did not
challenge paragraph 34 of the trial court=s findings of fact and conclusions of law, which states, ASubstantial completion of the building was timely, and all conditions
precedent were met by Westwood.@  Thus, appellants failed to
challenge an alternative finding of the trial court that supports its
judgment:  that Westwood did not fail to
perform its obligations under the Agreement.[4]  We overrule appellants= third issue.








 Whether Appellants Estopped from
Claiming Westwood Breached Agreement

In their
fourth issue, appellants contend that the trial court erred by concluding that
appellants are estopped from claiming Westwood breached the Agreement
first.  Initially, they contend that
equitable principles, such as estoppel, are not applicable in breach of
contract cases.  Such a contention is
incorrect, however, because estoppel is routinely applied by courts in contract
cases.  See, e.g., Cal-Tex. Lumber Co.
v. Owens Handle Co., 989 S.W.2d 802, 821 (Tex. App.CTyler 1999, no pet.); Wright Way Constr. Co. v. Harlingen Mall Co.,
799 S.W.2d 415, 422 (Tex. App.CCorpus Christi 1990, writ denied).

Next, appellants contend that
there is no evidence to support an estoppel finding because the evidence does
not support a finding that appellants intentionally misled Westwood, nor a
finding that Westwood relied on any such misrepresentation or concealment to
its detriment.








Estoppel is defined in
general as conduct which causes the other party to materially alter his
position in reliance on that conduct.  Roberts
v. Clark, 188 S.W.3d 204, 213 (Tex. App.CTyler 2002, pet. denied); Braugh v. Phillips, 557 S.W.2d 155,
158 (Tex. Civ. App.CCorpus
Christi 1977, writ ref=d
n.r.e.).  To invoke the doctrine of
estoppel, all the necessary elements of estoppel must be present.  Roberts, 188 S.W.3d at 213; Douglas
v. Aztec Petroleum Corp., 695 S.W.2d 312, 317 (Tex. App.CTyler 1985, no writ).  The
elements of equitable estoppel are (1) a false representation or concealment of
material facts, (2) made with knowledge, actual or constructive, of those
facts, (3) with the intention that it should be acted on, (4) to a party
without knowledge or means of obtaining knowledge of the facts, (5) who
detrimentally relies on the representations. 
Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962
S.W.2d 507, 515B16 (Tex.
1998); Argyle ISD ex rel. Bd. of Trustees v. Wolf, 234 S.W.3d 229, 241
(Tex. App.CFort Worth 2007,
no pet.).

One of the essential
requisites of estoppel is a reasonable or justified reliance on the conduct or
statements of the person sought to be estopped by the person seeking the
benefit of the doctrine.  Roberts,
188 S.W.3d at 213; Douglas, 695 S.W.2d at 317.  The purpose of estoppel is for the protection
of those who have been misled by that which upon its face was fair.  Roberts, 188 S.W.3d at 213; Douglas,
695 S.W.2d at 317.  A person may not
assert estoppel for the purpose of shielding himself from the results of his
own dereliction of duty.  Roberts,
188 S.W.3d at 213; Douglas, 695 S.W.2d at 317.

Misrepresentation or Concealment








Appellants challenge the
trial court=s findings
that Soitis changed its business plan in the summer of 2005 and concealed this
fact from Westwood as well as its intentions with regard to the building.  It also challenges the trial court=s finding that Soitis never intended to agree on the outstanding
issues and misled Westwood into believing that it was going to close to obtain
the benefit of additional contract defenses. 
According to appellants, the evidence conclusively shows that Robertson
candidly informed Westwood that Soitis no longer intended to occupy the
building and that appellants fully intended to close on the building up until
Robertson received the email from Burtin regarding Purchaser Delays.

During closing arguments, the
trial court stated the following:

What concerns me about this is I=ve
never been able to figure out based on the evidence I=ve
heard, when your client [appellants] said they had the money, what
justification they had that they kept stringing out the closing.

 

. . .
.

 

 . . . And
then we have a series of reassuring e-mails and meetings accommodating the
purchaser as the purchaser continues to lead on the builder that they=re
going to close until, oddly enough, they get just past the number of days
[Westwood] pointed out that might be arguably in the delay.

 

. . .
.

 

. . . I pretty much have reached [the] conclusion
that there=s
some credibility issues on both sides - - and I=m
worming my way through that.

 

. . .
.

 








Pretty - - pretty limited testimony whenever a
client says he didn=t
look at it [referring to Robertson=s testimony that he did not
know there was a possibility of terminating the Agreement until after Burtin
sent the email alleging Purchaser Delays]. 
He didn=t testify
that he didn=t
have lawyers reviewing it.  I don=t
think the Indianapolis law firm came up with an overnight opinion on the
contract this size without consulting with its clients.  It . . . does beg me to ignore reality.

 

So in the
engagement of the Indiana lawyers, it=s something the Court may inquire into, but I=m not . . . gonna buy into the fact that the Indiana lawyers were
faxed the contract the night before they authored the termination advice and
told the client to do it.

It is clear from the trial court=s comments that the judge did not necessarily believe Robertson=s testimony regarding appellants= intentions to close the Agreement.

The trial court was entitled
to disbelieve Robertson=s and
Staneff=s testimony that Soitis intended to close on the building until just
before the scheduled closing date; the trial court=s comments show that it instead construed Soitis=s failure to respond to Westwood=s closing inquiries with any firm details as an intent not to close if
at all possible.  As the finder of fact,
the trial court was entitled to believe or disbelieve all or part of any
witness=s testimony.  See Shear Cuts,
Inc. v. Littlejohn, 141 S.W.3d 264, 270B71 (Tex. App.CFort Worth
2004, no pet.).  Accordingly, there is
sufficient evidence to support the trial court=s finding of misrepresentation, concealment, or both on the part of
Soitis as to its intentions regarding closing.








Reliance

Appellants
also contend that Westwood cannot have relied on any misrepresentation or
concealment because the evidence shows that Westwood nevertheless continued
construction of the building even after Robertson=s November 7, 2005 instructions to stop work on the building.  However, Burtin testified that because of
Robertson=s
instruction, Westwood did not press to obtain a certificate of occupancy for
the exterior shell.  According to Burtin,
had Robertson not given that instruction, Westwood would have pressed the
construction contractor to complete installation of the last item neededCthe wall mounted lightCso that a certificate could be issued. 
And if Westwood had been able to obtain that certificate, appellants
would not have been able to terminate for the reason they relied on at trialCthat construction of the exterior was not substantially complete as
defined in the Agreement because a certificate of occupancy had not been issued
for the shell.  We conclude that this is
sufficient evidence to support the trial court=s findings and conclusions on estoppel.

We overrule appellants= fourth issue.








   Whether Trial Court Correctly Concluded That Appellants Waived
Right to

       Terminate Because of Westwood=s
Failure to Substantially Complete

 

In their
fifth and final issue, appellants contend that the trial court erred by
concluding that Soitis waived any failure by Westwood to comply with all of its
obligations under the Agreement. 
According to appellants, because waiver requires a knowing and
intentional relinquishment of a rightCand Robertson did not know the extent of appellants= rights under the Agreement until he reviewed it after receiving
Burtin=s January 21 emailCappellants cannot have waived those enforcement rights.

However, we have already
pointed out the trial court=s skepticism regarding Robertson=s knowledge of the extent of the contents of the Agreement.  Moreover, a party to a contract is presumed
to have read and understood its contents. 
UBS Fin. Servs., Inc. v. Branton, 241 S.W.3d 179, 189 (Tex. App.CFort Worth 2007, no pet.); see Mikey=s Houses LLC v. Bank of Am., N.A.,
232 S.W.3d 145, 167 (Tex. App.CFort Worth 2007, no pet. [mand. pending]) (Livingston, J.,
dissenting).  Accordingly, we conclude
and hold that the trial court did not err by concluding that appellants waived
any failure of Westwood to comply with the Agreement.  We overrule appellants= fifth and final issue.








                                             Conclusion

Having overruled appellants= five issues, we affirm the trial court=s judgment.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL: CAYCE, C.J.; LIVINGSTON and HOLMAN, JJ.

DELIVERED: August 14, 2008











[1]AExcusable
Delay@ is
defined as delay in substantial completion for reasons Abeyond
the reasonable control of Seller,@ such as delay because of
strikes, governmental regulatory orders, weather, or changes to the project
made by the purchaser.  APurchaser
Delay@ is
defined as  delay in substantial
completion Adue
to any act or omission@ of
the purchaser, including delay because of any changes to the project made by
the purchaser. 





[2]Robertson
testified at trial, however, that after November 9, 2005, Soitis never intended
to occupy the building.





[3]Although
appellants=
counsel did ask several questions related to Westwood=s
continuing construction of the shell after Robertson instructed them to put the
building on hold, those questions were clearly related to an attempt to prove
that Westwood, rather than appellants, was responsible for the delays in
substantial completion of the exterior.





[4]When
findings of fact are filed and are unchallenged, they occupy the same position
and are entitled to the same weight as the verdict of a jury; they are binding
on an appellate court unless the contrary is established as a matter of law or
there is no evidence to support the finding. 
McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986); Raman
Chandler Props., L.C. v. Caldwell=s
Creek Homeowners Ass=n, Inc., 178
S.W.3d 384, 390 (Tex. App.CFort Worth 2005, pet.
denied).